UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 1 of 12 |

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—[REDACTED] ORDER RE DEFENDANT'S MOTION TO DISMISS [110]**

This matter is before the Court on Defendant Comerica Bank's Motion to Dismiss the Consolidated Class Action Complaint ("MTD"). [Doc. # 110]; Consolidated Complaint ("Consol. Compl.") [Doc. # 91]. The motion is fully briefed. Opp. [Doc. # 119]; Reply [Doc. # 121]. For the following reasons, the Court **GRANTS** in part and **DENIES** in part the MTD.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises out of a large Ponzi scheme operated by Robert H. Shapiro through a series of entities purportedly operating as a real estate investment company (collectively, "Woodbridge"). Consol. Compl. at ¶ 1. Plaintiffs invested in securities offered by Woodbridge, and when the scheme collapsed, they lost their investments. *Id.* at ¶¶ 1, 2. Shapiro was charged with various federal offenses and pleaded guilty to conspiracy to commit wire and mail fraud and tax evasion. *Id.* at ¶ 4.

Woodbridge raised more than $1.22 billion from investors through promissory notes and "fund offerings." *Id.* at ¶ 45, 47. Woodbridge claimed that it earned revenue by lending the money from investors to third-party borrowers, and securing those loans with real property. *Id.* at ¶ 49. In reality, however, Woodbridge only issued around $675 million in loans to secure the investments, and only generated $13.7 million from the third-party borrowers. *Id.* at ¶ 54. Despite this minimal income, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments. *Id.* Woodbridge sustained its operations through a continuous infusion of new investor funds and existing investors rolling over their investments so that Woodbridge could avoid repaying their principal. *Id.* at ¶ 55. This continued until December 1, 2017, when it missed its first interest payment to investors. *Id.* at ¶ 56. At that point, Woodbridge owed investors

---

[1] The Court assumes the truth of the Consol. Compl.'s factual allegations solely for the purpose of deciding Defendants' motion to dismiss.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
| Title | *In re Woodbridge Investments Litigation* | Page | 2 of 12 |

more than $961 million in principal. *Id.* On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy. *Id.* at ¶ 57.

Defendant Comerica Bank maintained all of Woodbridge's financial accounts (the "Woodbridge Accounts"). *Id.* at ¶ 4. Plaintiffs allege that the Court can reasonably infer from the following circumstances that Comerica had actual knowledge of, and provided substantial assistance to, Shapiro's fraudulent scheme. *Id.* at ¶ 8.

First, Comerica was motivated to keep Woodbridge as a customer, because it was highly profitable for the bank to do so. *Id.* at ¶¶ 60–62. Shapiro allegedly developed a close relationship with the Studio City, California branch staff as he opened nearly two dozen accounts at that location. *Id.* at ¶ 63. Because of this close relationship, Plaintiffs contend that Comerica gave Woodbridge "special treatment." This included giving Shapiro immediate access to deposited funds, manually approving checks that otherwise would have bounced, and giving Shapiro access to a special commercial banking application—never before available to customers—that expedited Shapiro's ability to make transfers. *Id.* at ¶¶ 65–68.

Second, Plaintiffs assert that Comerica continued to facilitate the Woodbridge scheme despite "numerous indicia of wrongdoing." Woodbridge transferred money from investment fund accounts into operating accounts, and used the operating accounts to cover overhead expenses, as well as to transfer back into investment accounts to pay interest and principle back to investors. *Id.* at ¶¶ 76–91. This is allegedly inconsistent with Woodbridge's purported business model, in which the investment fund money would be used to offer secured loans, and the income from the interest on those loans would pay both the overhead expenses and the interest to the investors. *Id.* Comerica allegedly knew that Woodbridge was not profitable and ran at a deficit, which by September 2017 reached $250 million. *Id.* at ¶ 87. Comerica also knew that more than 99% of Woodbridge's transfers were made in round numbers ending in "0.00," it regularly used "pass-through" operating accounts, and it made large transactions with attorney trust accounts, all of which are classis characteristics of a Ponzi scheme. *Id.* at ¶¶ 92–103. Further, Shapiro diverted investor funds for suspicious expenditures such as luxury goods, alimony to his ex-wife, and approximately $9 million dollars to pay off personal credit card debt. *Id.* at ¶¶ 104–106. Shapiro was also the sole signatory for all Woodbridge bank accounts and Comerica purportedly knew that Shapiro and Woodbridge were never licensed by the SEC to sell securities. *Id.* at ¶¶ 108–110.

In addition, Comerica's fraud-alert system repeatedly flagged suspicious transactions in Woodbridge accounts, but it took no action in response to these alerts. *Id.* at ¶¶ 118. ████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ *Id.* at ¶¶ 118–139. Defendant

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
|---|---|---|---|

| Title | *In re Woodbridge Investments Litigation* | Page | 3 of 12 |
|---|---|---|---|

received more than 100 alerts, or "red flags," triggered by the Woodbridge accounts in 2016 and 2017 alone. *Id.* at ¶ 140. Defendant's analysts noticed suspicious activities inconsistent with a legitimate business model, but "brush[ed] aside" the warnings. *Id.* at ¶ 142. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at ¶¶ 140–183.

After Shapiro's scheme started to unravel, Woodbridge declared chapter 11 bankruptcy, and the resulting bankruptcy plan became effective on February 15, 2019. *Id.* at ¶¶ 219–20. The plan created the Woodbridge Liquidation Trust to administer the liquidation trust assets and make distributions to Trust beneficiaries. *Id.* at ¶ 221. The assets of the Trust include causes of action held by investors who elected to contribute their causes of action relating to Woodbridge to the Trust. *Id.* at ¶ 223.

## II.
## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a pleading need not contain "detailed factual allegations," it must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id*. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating the sufficiency of a complaint, courts must accept all factual allegations as true. *Id.* (citing *Twombly*, 550 U.S. at 555). Legal conclusions, in contrast, are not entitled to the assumption of truth. *Id.*

## III.
## DISCUSSION

Defendant argues that the Court should dismiss the Consolidated Complaint because Plaintiffs lack standing to sue, their claims are preempted by federal law, and their claims fail as inadequately pled. The Court discusses each of these contentions in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 4 of 12 |

### A. Standing

Defendant argues that Plaintiffs lack standing to pursue their claims in this action because when the United States Bankruptcy Court for the District of Delaware entered its confirmation order approving a bankruptcy plan relating to Woodbridge, the plan created the Liquidation Trust and assigned all causes of action relating to the Woodbridge entities to the Trust. MTD at 42-46. The bankruptcy plan states that:

> The Liquidation Trust . . . will have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Liquidation Trust Actions without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement.

Jenkins Decl., Ex. A ("Bankruptcy Plan") at § 5.4.15 [Doc. # 110-2].[2] The plan defines "Contributing Claimants" as "Noteholders and the Unitholders that elect on their Ballots to contribute Contributed Claims to the Liquidation Trust." *Id.* at § 1.29.

Plaintiffs counter that the Liquidation Trust does not have authority to prosecute their claims because it only has the authority to prosecute claims for Contributing Claimants and none of them elected to contribute their claims to the trust. Opp. at 42.[3] Whether that is true is an issue of fact unripe for resolution at the pleading stage. At this point in the litigation, the Court must accept Plaintiffs' allegation. If Defendant can produce evidence at the proper stage of the proceedings that Plaintiffs each assigned their claims to the Liquidation Trust, then they would lack standing to sue. But, as Plaintiffs argue, class standing requirements are met if even one plaintiff has standing individually. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

---

[2] The Court may take judicial notice of the bankruptcy plan because it is a document filed in a public court case whose accuracy and credibility are not subject to reasonable dispute. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006).

[3] The Consolidated Complaint does not explicitly allege that no Plaintiff contributed his claims to the Liquidation Trust. But it does allege that each of them invested money in Woodbridge, and that a "substantial number of Woodbridge investors assigned their claims against Comerica to the Trust." Consol. Compl. at ¶ 224. Based on those allegations, the Court can reasonably infer that Plaintiffs are among the smaller number of Plaintiffs who did not assign their claims to the trust.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 5 of 12 |

   Defendant makes two other arguments relating to standing, but nether compels dismissal at this stage. It first argues that the Court should *transfer* this case to the United States Bankruptcy Court for the District of Delaware due to Plaintiffs' lack of standing. MTD at 42. But, as discussed above, Plaintiffs have sufficiently alleged that they have standing at this stage. Second, Defendant argues that Plaintiffs improperly attempt to include the Liquidation Trust itself as a member of the putative class. MTD at 44. Neither side has provided case law that definitively answers the question of whether a liquidation trust can be a member of a class action. But that question does not need answering at this time. *See In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 616 (N.D. Cal. 2007) (denying defendant's motion to strike class allegations as premature at the pleading stage). Regardless of whether the trust can be a class member, Plaintiffs have plausibly alleged that at least one of them has standing to sue. The Court therefore **DENIES** Defendant's MTD as to its standing argument.

  **B.**  **Preemption**

   Comerica next argues that Plaintiffs' claims are all preempted because the Banking Security Act ("BSA") shields it from liability for either submitting or failing to submit a Suspicious Activity Report ("SAR") relating to Woodbridge's banking activity. Federal laws can preempt state laws through "(1) express preemption; (2) field preemption (sometimes referred to as complete preemption); and (3) conflict preemption." *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). Comerica claims that the BSA defeats Plaintiffs' claims through express preemption and conflict preemption, but it does not clearly separate its two theories. *See* MTD at 36-41. It is clear, however, that both of Defendant's preemption arguments rely on the contention that the BSA's safe harbor provision insulates Defendants from liability for any of Plaintiffs' claims.

   The safe harbor provision states that:

> Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 6 of 12 |

31 U.S.C. § 5318(g)(3)(A). Courts have held that this provision "explicitly preempts state law claims filed against financial institutions complying with its requirements." *See, e.g., Stoutt v. Banco Popular de Puerto Rico*, 158 F. Supp. 2d 167, 176 (D.P.R. 2001). While the safe harbor provision protects financial institutions from liability for *making disclosures* required under the BSA, it does not explicitly protect them from the *failure* to make a disclosure. *See* 31 U.S.C. § 5318(g)(3)(A). Plaintiffs argue that their claims are based on Defendant's "*failure* to act, by filing a SAR or otherwise." Opp. at 41.

Nonetheless, to the extent that Plaintiffs' claims are premised on Defendant's failure to submit an SAR, their claims are preempted. Federal regulations provide that SARs are confidential and that banks "shall not disclose an SAR or any information that would reveal the existence of an SAR." 12 C.F.R. §§ 21.11(k), 208.62(j); *see also Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 725 (9th Cir. 2012) (federal regulations can preempt state laws). In other words, federal law prohibits banks from disclosing the existence of an SAR, even if doing so would aid their case in litigation. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999). This federally-mandated secrecy pertaining to SARs prohibits Plaintiffs from bringing state law claims against Comerica for failing to submit an SAR because the only way for Comerica to avoid liability under such causes of action would be to disclose the existence of the SAR in question. Defendant would therefore be faced with a dilemma: violate state law by refusing to disclose the SAR or violate federal law by disclosing it. Plaintiffs' claims are therefore preempted to the extent that they rely on Comerica's failure to file a SAR.[4] *See Arizona v. United States*, 567 U.S. 387, 399 (2012) ("[S]tate laws are preempted when they conflict with federal law. This includes cases where compliance with both federal and state regulations is a physical impossibility") (internal quotations omitted).

But Plaintiffs' claims appear to rely on conduct that goes beyond Comerica's purported failure to submit an SAR. *See, e.g.,* Consol. Compl. at 266 (stating that Defendant violated certain "anti-money laundering regulations, including those requiring implementation of a program to ensure adequate due diligence of banking customers and their account activity").

Accordingly, Plaintiffs' claims are preempted by federal law to the extent they contend that Defendant violated state law by failing to submit a SAR. The claims are not preempted in any other respect.

---

[4] This applies equally to Plaintiffs' UCL claim, discussed further below. Although liability under the UCL depends on the defendant having violated another substantive law, the Ninth Circuit has held that a UCL claim cannot lie if federal law forecloses liability under predicate law. *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-103-DMG (MRWx) | Date | August 5, 2020 |
|---|---|---|---|

| Title | *In re Woodbridge Investments Litigation* | | Page | 7 of 12 |
|---|---|---|---|---|

### C.  Plaintiffs' Aiding and Abetting Claims

Plaintiffs' first and second claims are for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.  Under California law, "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person."  *Casey v. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005) (quoting *Sanders v. Superior Court*, 27 Cal. App. 4th 832, 846 (1994)).

Comerica argues that Plaintiffs' claims are deficient under either prong.  As explained in Section III.D, *infra*, Comerica does not owe Plaintiffs any duty of care.  This forecloses any liability under the second prong.  Defendant also argues that Plaintiffs have not adequately pled Defendant's actual knowledge under the first prong.  The Court disagrees.

As a preliminary matter, the parties disagree about the proper pleading standard to apply to Plaintiffs' allegations of knowledge.  Defendant first cites California case law to establish that pleading actual knowledge is "very difficult."  MTD at 20.  Whether or not that is true as a matter of California civil procedure, in federal court, the Federal Rules of Civil Procedure apply.  *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995).  Defendant contends that, under the Federal Rules, Plaintiffs must satisfy Rule 9's heightened particularity standard.  But Rule 9 is clear that plaintiffs may plead knowledge generally.  Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Plaintiff therefore need only satisfy the normal Rule 8 pleading standard described in Section II, *supra*.

To state a claim for aiding and abetting under the first prong, plaintiffs must show that the defendant has actual knowledge of the "specific primary wrong the defendant substantially assisted." *Casey*, 127 Cal. App. 4th at 1145 (citing *Lomita Land & Water Co. v. Robinson*, 154 Cal. 36, 47 (1908).  In other words, actual knowledge requires a defendant to "reach a conscious decision to participate in tortious activity."  *Id.* at 1146.

Defendant relies heavily on *Casey*, which notes that a suspicion of wrongful activity does not amount to actual knowledge.  *See id.*  But the plaintiffs in *Casey* alleged only that the defendant knew generally that the wrongdoers were "involved in a criminal and wrongful enterprise."  *Id.* at 1153.  The *Casey* plaintiffs also conceded that the defendant was unaware of the source of the funds which were being misappropriated.  *Id.* at 1152.

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-103-DMG (MRWx) | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 8 of 12 |

Here, on the other hand, Plaintiffs allege that Comerica knew that Shapiro and Woodbridge perpetrated fraud on investors and breached their fiduciary duties to investors despite that knowledge. Consol. Compl. at ¶¶ 244, 253–54. Further, Plaintiffs state that Defendant was aware of its role in the Woodbridge scheme. *Id.* at ¶ 246. Plaintiffs also lay out extensive allegations to support these statements, including Defendant's close business relationship with Shapiro, its awareness of banking activity inconsistent with Woodbridge's stated business model, and Shapiro's disbursements and personal expenditures from investor funds. They also claim that the bank knew that Woodbridge was co-mingling investor funds, not earning any significant source of revenue, and paying out large amounts of money to investors and Shapiro. *Id.* at ¶¶ 87, 92-103, 104-06, 108-10.

These allegations are more like those in *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003). In *Neilson*, the plaintiffs alleged that the defendant bank knew that their customer was engaged in fraud and nevertheless breached its fiduciary duty to its customers, the plaintiffs. *Neilson*, 290 F. Supp. 2d at 1119. The court stated:

> The complaint details the manner in which the Ponzi scheme operated, describes Slatkin's fraudulent transactions, and outlines the Banks' involvement in these activities. It alleges, in particular, that the Banks utilized atypical banking procedures to service Slatkin's accounts, raising an inference that they knew of the Ponzi scheme and sought to accommodate it by altering their normal ways of doing business. This supports the general allegations of knowledge.

*Id.* at 1120; *see also Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1208 (C.D. Cal. 2006) (holding that similar allegations were sufficient to state a claim). Given the similarities between the alleged conduct in this case and that in *Neilson*, Plaintiffs' allegations are sufficient to plead actual knowledge.

Comerica argues that allegations that a defendant bank was aware of certain "red flags" or atypical banking transactions suggestive of fraud are insufficient by themselves to establish actual knowledge. MTD at 2 (citing, *e.g., Lamm v. State Street Bank and Trust*, 749 F.3d 938, 950 (11th Cir. 2014) ("Alleging that a bank disregarded 'red flags' such as 'atypical activities' on a customer's account is insufficient to establish knowledge."); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) ("As discussed above, these 'red flags,' as alleged, were insufficient to establish a claim for aiding and abetting fraud because, although they may have put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge")). But all of the cases that Defendant cites come from outside this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-103-DMG (MRWx) | Date | August 5, 2020 |
|---|---|---|---|

| Title | *In re Woodbridge Investments Litigation* | | Page | 9 of 12 |
|---|---|---|---|---|

circuit. The Ninth Circuit, on the other hand, has suggested that a bank's decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge. *In re First All. Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006) ("That [the bank] came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard . . . ."). Defendant attempts to distinguish *First Alliance* on the bases that: (1) other evidence in that case also demonstrated the bank's actual knowledge; and (2) the underlying claims in that case were for Truth in Lending Act violations and fraudulent lending practices by a mortgage originator. MTD at 13. These are distinctions without a difference. The fact that the plaintiffs in that case adduced *more* evidence than just the "ignored" red flags does not diminish the Ninth Circuit's clear statement that unheeded red flags "are enough to establish actual knowledge." And Plaintiffs do not rely on *First Alliance* as a factual analogy for their claims— they cite it for the general proposition that disregarded red flags are indicia of actual knowledge. That general principle applies to this case despite the differences between the claims at issue and those in *First Alliance*.

Moreover, as discussed above, Plaintiffs *do not* rely solely on the fact that Comerica purportedly ignored red flags of which it was aware. They set out detailed allegations pertaining to, for example, the closeness of Comerica's relationship with Shapiro and the purportedly obvious flaws in Woodbridge's business model. These allegations, on top of those relating to the red flags that Comerica allegedly ignored, are sufficient to state a claim for aiding and abetting fraud and breach of fiduciary duty. The Court therefore **DENIES** Comerica's MTD as to Plaintiffs' first and second claims.

### D. Plaintiffs' Negligence Claim

Comerica next argues that Plaintiffs' third cause of action for negligence should be dismissed because it does not owe Plaintiffs a duty of care. To the extent that the negligence claim relies on Comerica's failure to file an SAR, it is preempted by the BSA. Even if the claim relies on an alternative theory, however, it fails because it is true that Comerica owes no duty of care to Plaintiffs.

As a general rule in California, banks owe no duty to noncustomers. *Casey*, 127 Cal. App. 4th at 1149; *Evans v. ZB, N.A.*, 779 Fed. Appx. 443, 444 (9th Cir. 2019). The California Supreme Court has identified an exception to this rule, however, that exists when an individual attempts to deposit a check bearing objective signals of fraud and the individual is not the check's payee. *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal. 3d 671, 693–96 (1978). The court in *Sun 'n Sand* found that the bank owed the non-customer plaintiff a duty of inquiry, but noted that the bank's obligation was still minimal. *Id.* at 695.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-103-DMG (MRWx)** | Date | August 5, 2020 |
| Title | *In re Woodbridge Investments Litigation* | Page | 10 of 12 |

The parties agree that Plaintiffs are not Comerica customers, but they disagree as to whether the *Sun 'n Sand* exception applies in this case. Comerica argues that the exception is narrow, and applies only to facts like those in *Sun 'n Sand*, while Plaintiffs argue that it applies in other "extraordinary circumstances" as well. The California Court of Appeal has consistently limited *Sun 'n Sand* to its specific facts. *See, e.g.*, *Chazen v. Centenniel Bank*, 61 Cal. App. 4th 532, 545 (1998) ("*Sun 'n Sand* and its progeny have held banks to be subject to a duty of care toward non-depositors only in narrow factual circumstances: each case involved the bank's liability for allowing a person to deposit a check, payable to someone else, into a personal account, under circumstances that should have alerted the bank to the possibility of fraud"); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 479–81 (1996) (describing post-*Sun 'n Sand cases* as all stemming from "the particular circumstances of the checks, endorsements or depositors, where the person attempting to negotiate the check is not the payee").

Nonetheless, Plaintiffs argue that the exception has broader applicability. They first cite to *Evans* for the proposition that if a bank "knows a customer is perpetrating fraud, it may not assist the customer accomplish the tort." *Evans*, 799 F. Appx. at 443. Their reliance on *Evans*, however, is misplaced for several reasons. First, *Evans* discusses *Sun 'n Sand* in the context of aiding and abetting claims—not negligence. Indeed, the Ninth Circuit's opinion appears not to disturb the district court's dismissal of the negligence claim in that case despite its discussion of *Sun 'n Sand*. *Id.* at 445, 446-47. Second, *Evans* is unpublished and therefore non-binding. *See* U.S. Ct. of App. 9th Cir. Rule 36-3. Third, and relatedly, to the extent that *Evans* or other unpublished cases on which Plaintiffs rely contradict the California Court of Appeal decisions described above, the Court must follow California's courts in deciding this issue of state law. *See In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) ("[I]n the absence of convincing evidence that the highest court of the state would decide differently . . . a federal court is obligated to follow the decisions of the state's intermediate courts.") (internal citations omitted).[5]

Because Plaintiffs have not alleged the existence of any objective signals of fraud on a check where the person attempting to deposit the check is not the payee, the narrow *Sun 'n Sand* exception does not apply in this case. The MTD is therefore **GRANTED** as to the negligence claim.

---

[5] Plaintiffs also cite to an unpublished district court decision declining to dismiss a negligence claim against a bank because the circumstances were "'sufficiently suspicious' as to give rise to a 'reasonably foreseeable' risk of loss to the Plaintiffs." *Aifang v. Velocity VII Limited Partnership*, 2015 WL 12745806 at *7 (C.D. Cal. 2015). Although *Aifang* relied on *Sun 'n Sand* in reaching its decision, *Aifang* appears to be in tension with the California cases interpreting and applying *Sun 'n Sand*. Like *Evans*, therefore, *Aifang* is unpersuasive.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-103-DMG (MRWx) | Date | August 5, 2020 |
| Title | *In re Woodbridge Investments Litigation* | Page | 11 of 12 |

### E. Plaintiffs' UCL Claim

Finally, Comerica contends that Plaintiffs' UCL claim should fail for three reasons: (1) *Casey*'s actual knowledge standard compels dismissal, (2) Plaintiffs do not have UCL standing, and (3) the UCL claim is not cognizable to the extent it relies on Comerica's failure to submit a SAR. The Court discusses each argument in turn.

#### 1. *Casey* Does Not Require the Court to Dismiss the UCL Claims

First, Comerica cites *Casey* for the proposition that if a plaintiff does not properly plead actual knowledge for the purposes of its aiding and abetting claims, the defendant's alleged conduct cannot serve as the basis for a UCL claim. *Casey*, 127 Cal. App. 4th at 1153–54. Although this is a correct legal statement, Plaintiffs have adequately pleaded Defendant's actual knowledge. *See* Section III.C, *supra*.

#### 2. Plaintiffs Have UCL Standing

Next, Comerica argues that Plaintiffs do not have standing to pursue a UCL claim. UCL standing requires that plaintiffs have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. In other words, "to pursue a UCL claim, the plaintiff must show that the practices that it characterizes as unlawful caused it to suffer actual economic injury." *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 233 Cal. App. 4th 1321, 1333 (2015).

Comerica cites several cases—none of which have facts similar to this case—to attempt to show that Plaintiffs have not alleged how Comerica's conduct caused Plaintiff's losses. *See, e.g., Hall v. SeaWorld Entertainment, Inc.*, 747 Fed. Appx. 449, 451–52 (9th Cir. 2018) (finding no causation where plaintiff claims they would not have bought tickets had they known defendant was violating an animal cruelty statute). But the Complaint effectively conveys Plaintiffs' causation theory. Plaintiffs contend that Comerica both affirmatively facilitated Woodbridge's misappropriation of funds, and failed to stop maintaining Woodbridge's accounts when it had actual knowledge of fraud. Had Comerica not allowed these transactions, or had Comerica stopped servicing the accounts, Plaintiffs contend that Woodbridge would not have been able to continue the fraudulent operations that harmed them. These allegations are sufficient to demonstrate UCL standing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-103-DMG (MRWx) | Date | August 5, 2020 |
|---|---|---|---|
| Title | *In re Woodbridge Investments Litigation* | Page | 12 of 12 |

### 3. Plaintiffs' UCL Claim is Cognizable to The Extent It Relies on Non-SAR Conduct

Lastly, Comerica argues that Plaintiffs cannot base their UCL claim on the failure to file an SAR, since, as discussed above, it can neither confirm nor deny that it has done so. To the extent that Plaintiffs' UCL claim relies on Defendant's SAR-related conduct, it is preempted. To the extent that Plaintiffs' UCL claim relies on other conduct, Defendant's MTD does not direct any argument on this issue at that conduct. *See* MTD at 31-34. The Court therefore **GRANTS** the MTD as to the UCL claim to the extent it relies on a failure to file an SAR, and **DENIES** the MTD as to the UCL claim to the extent it relies on other violations arising from non-SAR-related conduct.

## IV.
## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's MTD. Because Plaintiffs may be able to cure the defects identified herein if given the chance to allege new or different facts, the Court **GRANTS** leave to amend. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (courts should not deny leave to amend unless "the pleading could not possibly be cured by the allegation of other facts"). Plaintiffs shall file their First Amended Consolidated Complaint by **August 26, 2020**. Comerica shall file its response within 21 days after the filing of the First Amended Consolidated Complaint.

**IT IS SO ORDERED**.