Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
jelias@girardsharp.com
ttan@girardsharp.com
mcox@girardsharp.com

*Interim Lead Class Counsel*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| IN RE WOODBRIDGE INVESTMENTS LITIGATION | Case No. 2:18-cv-00103-DMG (MRWx) |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | DEMAND FOR JURY TRIAL |
| | REDACTED VERSION - FILED UNDER SEAL PURSUANT TO COURT'S ORDERS OF OCTOBER 1 AND DECEMBER 5, 2019 [DOC. ## 89, 118] |

Plaintiffs Mark Baker, Jay Beynon Family Trust DTD 10/23/1998, Alan and Marlene Gordon, Joseph C. Hull, Lloyd and Nancy Landman, Albert M. and Freda B. Lynch, Robert J. Prince, and Lilly A. Shirley on behalf of themselves and all others similarly situated, allege as follows against Defendant Comerica Bank ("Comerica").

## I.   SUMMARY OF THE ACTION

1.     This case arises out of a massive, multi-year Ponzi scheme operated by Robert H. Shapiro through a series of entities purportedly operating as a real estate investment company (collectively, "Woodbridge"). Plaintiffs invested in securities offered by Woodbridge. Woodbridge's owner and operator, Robert H. Shapiro, individually and through his affiliates, marketed promissory notes and other offerings as low-risk, high-yield investments backed by high-interest real-estate loans to third-party commercial borrowers. But Woodbridge made very few loans to independent borrowers and had minimal revenue other than money raised from new investors. Lacking the income to pay returns owed to Plaintiffs and other investors, Shapiro paid the returns using new investor money, raising more than $1.22 billion before the Ponzi scheme collapsed.

2.     By December 2017, after a lengthy investigation, the SEC was on the verge of filing suit against Woodbridge and Shapiro. With his Ponzi scheme unraveling and the SEC poised to act, Shapiro caused most of the Woodbridge companies to file for bankruptcy on December 4, 2017. Shapiro was eventually charged with various federal offenses, including conspiracy to commit money laundering, and pleaded guilty in August 2019 to conspiracy to commit wire and mail fraud and tax evasion. The investors face several hundred million dollars in losses.

3.     Woodbridge raised at least $1.22 billion from investors—but earned only $13.7 million in interest payments from independent borrowers. Even though it generated almost no income, Woodbridge returned $368 million in new investor funds disguised as principal and interest to existing investors.

4.     Comerica maintained all the Woodbridge accounts. Comerica executed

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

$1.66 billion in transfers, exceeding 10,700 transactions, between related Woodbridge accounts.  Most of these transfers involved monies swept out of investment accounts and commingled within a single operating fund.  Comerica used a range of investigation and monitoring tools to detect fraud, illegal transactions, and other suspicious activities in its accounts.  Woodbridge's banking activity triggered *hundreds* of internal alerts on these sophisticated monitoring systems warning Comerica of suspicious activity in Woodbridge accounts.  These alerts notified Comerica of banking activity in Woodbridge accounts associated with Ponzi schemes, money laundering, and bank fraud.

5.     Despite the alerts triggered by Woodbridge's frenzied related party transfer activity—itself a significant marker of fraud—Comerica bankers repeatedly signed off on the transfers as consistent with Woodbridge's business model, even after these systems showed that state regulators had fined Woodbridge for selling unregistered securities and ordered it to cease its operations.  At least one alert triggered by Woodbridge was escalated to Comerica's President of Community Banks, who ordered that no further action be taken.  The Texas Securities Commission notified Comerica that it had sanctioned Woodbridge. Comerica continued servicing the Woodbridge accounts.  Even news of a pending SEC investigation of Woodbridge did not deter Comerica from continuing to accept investors funds and carry out transfer orders at Shapiro's direction.

6.     The only business model consistent with Woodbridge's banking activity was—as Comerica's own internal systems repeatedly warned—the operation of a Ponzi scheme.  Had Woodbridge operated a legitimate business, Comerica would have processed deposits of investor funds into accounts associated with discrete offerings, executed transfers from those accounts to make loans to borrowers and pay overhead expenses, received incoming payments of interest from borrowers, and processed checks drawn on the surplus to pay returns to investors.  Comerica instead received hundreds of large round number deposits of new investor funds; executed transfers

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

comingling funds between and among separate Woodbridge affiliates; serviced "pass through" accounts, which began and ended each month with a similar balance but had tens of millions in interim activity; carried out large and numerous transactions with attorney trust accounts; processed millions in transfers from investor accounts to Shapiro's spouse; facilitated the dissipation of millions in investor funds on luxury goods and private jet travel; and processed thousands of outgoing checks each month (each personally signed by Shapiro) to pay interest and principal to earlier investors.

7.       Early on, Comerica identified Shapiro and Woodbridge a high-value relationship.  Woodbridge was a lucrative customer for Comerica's Studio City branch, generating fees through high frequency transfers, overdrafts, and other services. Woodbridge also maintained substantial balances.  Comerica employees abandoned any pretense of objectivity in their dealings with Woodbridge, and assumed *a priori* that Woodbridge and Shapiro could do no wrong.  Faced again and again with conduct that had no plausible explanation other than fraud, Comerica simply chose to preserve and prioritize its role as the depository for Woodbridge and Shapiro, continued to provide Shapiro critical banking services and facilitated his theft of millions in investor funds.

8.       Comerica is liable to Plaintiffs and the other investors—who seek damages through this action—by consequence of its actual knowledge of and substantial assistance to the Woodbridge Ponzi scheme.

## II.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiffs

9.       Plaintiff Mark Baker is a citizen of Florida residing in Weston, Florida.  Mr. Baker invested more than $400,000 in Woodbridge First Position Commercial Mortgage (FPCM) promissory notes and/or fund equity units directly with Woodbridge across multiple funds.

10.      Plaintiff Jay Beynon Family Trust DTD 10/23/1998 is a California entity located in El Segundo, California.  The Beynon Trust invested $500,000 in FPCM promissory notes.

3

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

11.     Plaintiffs Alan and Marlene Gordon are citizens of Florida residing in Sunrise, Florida.  The Gordons jointly invested a total of $200,000 in FPCM promissory notes and/or fund equity units directly with Woodbridge across multiple funds.  Marlene Gordon, acting as Trustee and with durable power of attorney for the Evelyn & Carl Newmark Trust, also invested another $100,000 in the name of that trust.

12.     Plaintiff Joseph C. Hull is a citizen of Pennsylvania residing in Media, Pennsylvania.  Mr. Hull invested a total of $950,000 in FPCM promissory notes and/or fund equity units directly with Woodbridge across multiple funds.

13.     Plaintiffs Lloyd and Nancy Landman are citizens of Nevada residing in Las Vegas, Nevada.  The Landmans jointly invested a total of $50,000 in FPCM promissory notes and/or fund equity units directly with Woodbridge across multiple funds.

14.     Plaintiffs Albert M. Lynch and Freda B. Lynch are citizens of South Carolina who reside in Spartanburg, South Carolina.  Mr. and Mrs. Lynch invested $200,000 in FPCM promissory notes and/or Woodbridge fund equity units.

15.     Plaintiff Robert J. Prince is a citizen of Pennsylvania residing in West Chester, Pennsylvania.  Mr. Prince invested a total of $820,000 in FPCM promissory notes and/or fund equity units directly with Woodbridge across multiple funds.

16.     Plaintiff Lilly A. Shirley is a citizen of Tennessee residing in Harriman, Tennessee.  Ms. Shirley invested a total of $529,510 in FPCM promissory notes and/or fund equity units directly with Woodbridge.

17.     Woodbridge represented to all Plaintiffs that their investments were loans to Woodbridge, for which Woodbridge would grant them security interests in, *inter alia*, Woodbridge's right, title, and interest in the underlying mortgage loan, and the promissory note evidencing the mortgage loan and represented that fund equity units were only being sold to "accredited investors."  Woodbridge further represented to Plaintiffs that they would have "good and marketable title" to Woodbridge's underlying loans to the purported third-party buyers; that their funds would be used to offer loans for commercial real estate to third-party buyers; that they would have a recorded first-

4

lien position in the properties; that their interest payments would be made from the interest payments made by the buyers; and that their investments were secured by the collateral for the underlying loan.  None of these representations were true when made.

18.     At no time did Comerica, Shapiro, Woodbridge, or any agent or employee thereof inform Plaintiffs that their funds would be allocated for purposes not authorized by them.  Nor did Comerica, Woodbridge, or Shapiro, or any other representative or agent thereof disclose to Plaintiffs that their investments would be unsecured; that their money would not be used for loans to third-party buyers in an arm's-length transaction; that the purported third-party borrowers would not pay interest on the "loans"; that the investments were not actually for the purchase of membership "units" in any particular investment fund; that their investments would be commingled with other investors' funds and used in furtherance of the Woodbridge Ponzi scheme; or that Woodbridge was a criminal enterprise.

19.     If any of these facts had been disclosed to Plaintiffs, they would not have invested their money with Woodbridge.

20.     Plaintiffs first learned that Woodbridge was not a legitimate investment concern after Woodbridge declared bankruptcy in December 2017.

**B.     Defendant**

21.     Defendant Comerica Bank is a Texas banking association with its principal place of business in Dallas, Texas.

22.     Comerica Bank is chartered by the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code. Comerica Bank is also a member of the Federal Reserve System under the Federal Reserve Act, and its deposits are insured by the Federal Deposit Insurance Corporation (FDIC).  Comerica is thus subject to federal laws and regulations promulgated by the Federal Reserve System and the FDIC.

23.     All Woodbridge bank accounts were maintained at Comerica.

24.     Comerica Bank is a subsidiary of Comerica Incorporated, which is

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    incorporated under Delaware law and headquartered in Dallas, Texas.  According to

2    Comerica Incorporated's Form 10-K filed with the SEC for 2019, "[b]ased on total

3    assets . . . it was among the 25 largest commercial United States financial holding

4    companies."

5        25.    As Comerica Incorporated acknowledged in its 2019 Form 10-K, it and its

6    subsidiaries are subject to United States anti-money laundering laws and regulations.

7    Comerica represents on its website that it "complies with the Bank Secrecy Act (BSA)

8    and USA PATRIOT Act requirements."

9        **C.    Relevant Non-Parties**

10       26.    Robert H. Shapiro served as Woodbridge's CEO.  At all relevant times,

11   Shapiro controlled the Woodbridge entities and was the sole signatory on Woodbridge's

12   bank accounts at Comerica.

13       27.    Woodbridge Group of Companies, LLC was a financial company based in

14   Sherman Oaks, California.  Formed in 2014, it functioned as the main company through

15   which Shapiro operated the Woodbridge Ponzi scheme during the relevant time period.

16       28.    WMF Management, LLC was a California LLC controlled by Shapiro.

17   WMF is a holding company for companies Shapiro controlled and operated, which

18   include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment

19   Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage

20   Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC,

21   Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan

22   Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC.

23   **III.   JURISDICTION AND VENUE**

24       29.    This Court has subject matter jurisdiction over all claims in this action

25   pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs and

26   Comerica are citizens of different states, the total amount in controversy exceeds $5

27   million, excluding interest and costs, and the class contains more than 100 members.

28       30.    This Court has subject matter jurisdiction over Plaintiffs' individual claims

6

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

under 28 U.S.C. § 1332(b) based on diversity of citizenship.  The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs.

31.     The Court has personal jurisdiction over Comerica because it aided and abetted Shapiro's Ponzi scheme and misappropriation of investor funds in California. Shapiro was a resident of Sherman Oaks, California, where Woodbridge was based and had employees.  Comerica's Studio City, California branch office opened, maintained and serviced the Woodbridge accounts at issue.  During the relevant time period, Comerica employees at that branch repeatedly visited Woodbridge's office in Sherman Oaks.  A substantial portion of the residential and commercial properties Woodbridge purchased using investor funds are located in the Los Angeles area.

32.     Venue is proper in this District under 28 U.S.C. § 1391 because Comerica is subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.   RELEVANT BANKING REGULATIONS

33.     Federal law requires banks to know their customers and understand their customers' banking behavior.  Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. §§ 1020.220(a)(1), (2).  Thus, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

34.     The Financial Industry Regulatory Authority (FINRA) likewise imposes know-your-customer requirements and mandates "reasonable diligence, in regard to the opening and maintenance of every account," including the obligation "to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

35.     Comerica is obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

7

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

36.     The BSA requires Comerica to develop, administer, and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

37.     Comerica also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

38.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

39.     Additionally, Comerica must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

40.     The federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering Manual (FFIEC Manual) summarizes BSA and anti-money laundering compliance program requirements, risks and risk

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

management expectations, industry sound practices, and examination procedures.  The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency.  *See* FFIEC BSA/AML Examination Manual, at p. 5 (2010).

41.     Banks must also ensure that their employees follow BSA guidelines.  Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.  Banks are therefore required to train all personnel whose duties may require knowledge of the BSA on that statute's requirements.

42.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual.  These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

43.     The FFIEC Manual identifies "lending activities" and "nondeposit account services"—including nondeposit investment products—as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency.  Thus, the FFIEC

1    Manual requires heightened due diligence on the part of banks when such services occur,

2    including determining the purpose of the account, ascertaining the source and funds of

3    wealth, identifying account control persons and signatories, scrutinizing the account

4    holders' business operations, and obtaining explanations for account activity.

5    **V.    FACTUAL ALLEGATIONS**

6        **A.    The Woodbridge Investment Scheme**

7        44.    Woodbridge raised more than $1.22 billion from over 8,400 investors

8    nationwide.  At least 2,600 of these investors used their individual retirement account

9    funds to invest nearly $400 million.

10       45.    Beginning in or about July 2012 through at least December 4, 2017, Shapiro

11   orchestrated a Ponzi scheme through the Woodbridge entities.  Woodbridge eventually

12   employed as many as 140 people in offices in several states.  Shapiro was the sole owner

13   and maintained exclusive operational control over Woodbridge and each of its affiliates.

14       46.    Woodbridge raised money by borrowing funds in connection with

15   promissory notes that investors purchased and through private placement subscription

16   arrangements under which investors purchased units in Woodbridge funds.  The

17   promissory notes, referred to in this complaint as FPCMs or FPCM notes—short for

18   First Position Commercial Mortgages—typically had a term of 12-18 months and were

19   marketed as paying a 5%-8% annual return on a monthly basis.  Woodbridge's

20   subscription offerings—the "Fund Offerings"—typically had a five-year term and were

21   marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five

22   years, a 2% accrued dividend and share of the profits.  None of the Woodbridge

23   offerings were registered under federal or state securities laws.

24       47.    Woodbridge relied in part on a network of hundreds of external sales agents

25   to solicit investments from the public through television, radio, and newspaper

26   advertising, cold calling, social media, websites, seminars, and in-person presentations.

27   Virtually none of these sales agents were registered with any regulatory agency.

28       48.    The purported revenue source enabling Woodbridge to pay returns to

10

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)**

investors was the interest a Woodbridge affiliate would be receiving on loans to third-party owners of commercial real estate.  Woodbridge represented to investors that its affiliate would raise money from investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."  According to a Woodbridge FAQ document, "[y]our loan is secured by a hard asset collateral—the property itself." Woodbridge further represented to investors that it conducted all due diligence, including title search and appraisal, on the commercial property and borrower. Woodbridge also represented that after one year, the third-party borrower would be obligated to repay Woodbridge the principal amount of the loan and that in the event of default Woodbridge had the option of foreclosing on the property to recover the full amount owed.

49.     Woodbridge told investors that the third-party borrowers were paying it 11-15% in annual interest for "hard money" loans.  The borrowers, Woodbridge told investors, were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.  Woodbridge told FPCM investors that their returns would be derived from those interest payments, falsely promising the investors a pro rata first-position "lien" interest in the underlying properties: "If you have a first position, that means you have priority over any other liens or claims on a property if the property owner defaults."  In the offering memoranda for the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's FPCMs. Woodbridge instead used the incoming funds for a range of unauthorized purposes, including paying other investors' returns.

50.     Woodbridge also told investors that it had another revenue source from "flipping" properties, i.e., buying them to develop and then sell for a profit.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

51.     Woodbridge's marketing materials contained the following graphic regarding the FPCMs:



**Now is the time to forego old-fashioned wealth-building solutions.**

Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?



Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

52.     Similarly, Woodbridge's marketing materials stated that it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents."  That statement was false. Contrary to Woodbridge's representations, almost all of the purported third-party borrowers—the "owner" and "property owner" in parts 2 and 3 of the above marketing graphic—were hundreds of *Shapiro*-owned and -controlled LLCs with no bank account

12

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    or source of income, and which never made any loan payments to Woodbridge.

2        53.    Shapiro supported Woodbridge's business almost entirely by raising new

3    investor funds and using them to pay returns to existing investors.  Woodbridge raised at

4    least $1.22 billion from FPCM and Fund Offering investors but issued only around $675

5    million in "loans" for real estate purportedly securing the investments.  Instead of

6    generating the promised 11-15% interest, the loans generated only $13.7 million from

7    third-party borrowers—far less than required to operate Woodbridge's business and pay

8    returns owed to investors.  Notwithstanding this shortfall, Woodbridge paid investors

9    more than $368 million in interest, dividends, and principal repayments.  Woodbridge

10   spent another $172 million on operating expenses, including $64.5 million for sales

11   commissions and $44 million for payroll, and $21.2 million to finance Shapiro's lavish

12   lifestyle.

13       54.    To sustain these Woodbridge operations, Shapiro needed a continuous

14   infusion of new investor funds as well as for existing FPCM investors to roll over their

15   investments at the end of their terms (ideally into longer-term Fund Offerings) so that

16   Woodbridge could avoid repaying the principal.

17       55.    To generate the large volume of investor funds needed to sustain the

18   Woodbridge operations, Woodbridge promoted the FPCM notes by offering incentives,

19   such as cash bonuses, to brokers who recommended these investments to their clients.

20   Woodbridge also established a program called "Pass It On" through which brokers were

21   encouraged to inform their colleagues about the FPCM notes.  Under that program, a

22   referring broker would earn 25 basis points on each FPCM sale closed by a broker

23   whom he or she referred.

24       56.    On December 1, 2017, still owing more than $961 million in principal to

25   investors, Woodbridge missed its first interest payments to investors.  On December 4,

26   2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

**B.      Comerica Aided, Abetted and Culpably Participated in the Woodbridge Fraud.**

57.     Comerica's actions and inaction[1] were integral to Shapiro's scheme to defraud investors.  It was through Comerica account transactions that Shapiro applied new investor funds to pay existing investor returns, disbursed investor funds to his wife and her company, and spent millions in investor funds for his own personal enjoyment.

58.      Shapiro could not have carried out his scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among bank accounts to conceal that Woodbridge was raising more money than the underlying properties and pledged collateral could support.  Shapiro's use of Comerica accounts to shuffle money through a tangle of affiliated entities enabled him to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide third-party mortgages.  Shapiro made no effort to hide his misuse of investor funds from Comerica.

**1.      Comerica Was Motivated to Keep Woodbridge as a Customer and Gave It Special Treatment.**

59.      Comerica had a substantial financial interest in continuing to service the activity in the Woodbridge accounts.  Approximately $1.66 billion flowed through Woodbridge's accounts at Comerica.  Comerica executed more than 11,000 transactions on the Woodbridge accounts, and the continuous activity in Woodbridge accounts made Woodbridge a highly profitable customer for Comerica.

60.      Comerica further profited off its Woodbridge accounts by charging overdraft fees when, as happened periodically, an account became overdrawn, leading to dozens of overdraft charges.  Comerica negotiated away portions of these charges, with the local branch manager playing the role of "good cop" and promising to negotiate on Shapiro's behalf with the "bad cops" beyond the branch office.

---

[1] Plaintiffs' claims are not predicated in whole or in part on whether Comerica filed or failed to file a Suspicious Activity Report (SAR) under the Bank Secrecy Act.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

61.     Comerica also profited from the Woodbridge accounts by investing money on deposit in them.

62.     Comerica's branch in Studio City, California had a particularly strong interest in maintaining Shapiro as a bank customer.  Shapiro opened nearly two dozen accounts at Comerica through its Studio City branch.

63.     Shapiro and his staff developed a close relationship with the Studio City branch staff, including manager ████████ and assistant manager ████████. As early as February 2012, Comerica's Studio City branch staff paid visits to Woodbridge's offices to conduct business.  In internal communications, these and other Comerica employees stressed the importance of maintaining Shapiro's goodwill and business.  As ██████ explained internally in August 2017, "Mr. Shapiro is a High End Client with a large relationship with Comerica Bank."

64.     Comerica gave Shapiro immediate access to deposited funds instead of observing the standard hold period on funds availability.  Immediate access to funds was essential to the operation of the Woodbridge Ponzi scheme, as Shapiro's accounts often ran a low or negative balance.  Comerica regularly approved "no hold requests" for deposits, often of tens of thousands of dollars or more, made to Woodbridge accounts.

65.     Even when Comerica's automated systems were unable to accommodate Shapiro's banking orders, its staff manually approved checks Shapiro had written that otherwise would have bounced.  In a September 2013 email to ████████, Shapiro demanded immediate access to funds that had not yet cleared so that checks he had written would not be rejected for insufficient funds.  Otherwise, Shapiro threatened, "not only will i close every account tomorrow, but i will sue the bank for damages" and "you have one hour and 45 minutes to solve this problem." ████████ turned for help to several colleagues, who were unable to release the hold on the funds.  She then wrote to them that she would "be monitoring the client's account tomorrow to make sure any checks that come through get paid."

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

66.     Likewise, in September 2016, Shapiro demanded of ████ that she lift a hold on deposits made to a Woodbridge account "like last time where I have use of the funds today."  He also asked if he "need[ed] to move any funds around" because there were "checks on return list."

67.     Around June 2013, Comerica gave Woodbridge access to a special commercial banking application that Comerica had "never provided . . . to any customers," according to the bank's Vice President for Information Security Architecture.  The application was an account access tool that expedited Shapiro's ability to make transfers, including transfers of investor funds.

68.     Even after the Woodbridge scheme began to unravel and was subject to increasing litigation, Comerica executives sought to assist and protect Shapiro.  In November 2016, Shapiro's attorneys at Gibson, Dunn & Crutcher LLP contacted ████████████, Comerica's Executive Vice President and General Counsel for California, regarding a subpoena that would be served on Comerica by the California Department of Business Oversight for documents related to Shapiro and the Woodbridge entities.  ████████ assured Gibson Dunn attorney Douglas Fuchs that Comerica would inform Shapiro's attorneys when the subpoena was received and that Comerica would also seek to provide Shapiro's attorneys with advance copies of documents to be produced to the California authorities.

69.     And on September 29, 2017, just days after Comerica received an SEC bulletin regarding a subpoena enforcement action against Woodbridge, Comerica personnel—including two vice presidents of AML compliance—emailed about negative news articles concerning Woodbridge.  One of the AML vice presidents justified Comerica's decision to continue servicing Woodbridge as follows: "I do not think the news feeds provide us with enough evidence to confirm that our customer is involved in a criminal enterprise."  On information and belief, Comerica never requested any justification from Shapiro for his pattern of suspicious banking activity, and there is no

16

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

indication Shapiro ever provided false information to Comerica in response to any due diligence inquiry.

### 2. Comerica Facilitated the Woodbridge Ponzi Scheme Despite Numerous Indicia of Wrongdoing by Shapiro and Woodbridge.

70.     Applicable banking regulations (*see supra* ¶¶ 34–44), and sound banking practice required Comerica to "know its customers"—Shapiro and Woodbridge—and maintain a customer due diligence program to predict the types and volume of transactions Shapiro and Woodbridge were likely to conduct so Comerica could identify any suspicious activity.  Yet Comerica continued to provide Shapiro with the banking support and account platforms needed to carry out his scheme to defraud even after state and federal proceedings brought Woodbridge's violations to light.

71.     Woodbridge was required to provide Comerica with its certified articles of incorporation, government-issued business license, and financial statements.  Comerica was required to understand the types of transactions a customer should, and actually does, make.  Thus, at a minimum, Comerica had to assign Woodbridge a "customer risk rating," monitor Woodbridge's accounts for anomalous or suspicious behavior, and if such behavior became too severe, stop doing business with Woodbridge.

72.     Comerica was required to review Woodbridge's financial statements and to collect and review information from Woodbridge about its business operations, the source of its funds, and the purpose of its accounts.

73.     Comerica recognized that Woodbridge's supposed business model consisted of raising money from investors and using it to make real-estate loans to borrowers.  Woodbridge would earn money based on the difference between the monthly interest rate it was charging its borrowers and the rate at which it was paying investor returns.  The monthly interest payments Woodbridge received from the borrowers would supply the funds used to pay the investors.

74.     Comerica knew that Woodbridge's operations were not consistent with its business model.  Woodbridge's banking activity should have reflected its receipt of

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

investor funds, use of those funds make loans to borrowers, receipt of interest payments from borrowers, and use of those funds to pay returns to investors.  But that was not what Comerica saw.  It saw a great deal of investor money entering Woodbridge accounts—and an array of other banking activities at odds with Woodbridge's claimed business model.

### a. Suspicious Transfers Between Related Accounts and Other Banking Activity That Was Inconsistent with Woodbridge's Stated Business Model

75.     Comerica knew that Woodbridge deposited checks from investors into its accounts at the bank.  Beyond Comerica's "know your customer" obligations, the nature of the deposits made it clear that the money came from investors, for a specified investment purpose, and was to be used for the benefit of the investor.  The checks were payable to a "Woodbridge Mortgage Investment Fund" account, with the real estate purportedly securing the investment often noted on the face of the check (e.g., the address of the commercial property that supposedly secured the investment).  Comerica's Studio City personnel also frequently communicated with Woodbridge's controller about the need to cover payments to investors.

76.     Instead of using the money deposited from these incoming checks to extend loans to borrowers out of the "Woodbridge Mortgage Investment Fund" account, Woodbridge transferred the investor funds into operating accounts at Comerica.  From there, Woodbridge paid salaries, commissions, and bonuses to employees and sales agents—and it also made large, unexplained transfers to attorney trust accounts.

77.     The transfer or commingling of funds among related accounts is a hallmark of a Ponzi scheme, particularly where that commingling fails to comport with a customer's business purpose.  The FFIEC Examination Manual thus identifies as red flags "[u]nusual transfers of funds [that] occur among related accounts or among accounts that involve the same or related principals."

78.     Shapiro pooled investor money in fund entity accounts at Comerica, then

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

commingled them into a single Woodbridge operating account under his control.  This commingling of funds among Woodbridge accounts occurred on a massive scale, and in contradiction of what Comerica knew to be Woodbridge's stated business model.

79.     Under Woodbridge's stated business model, an investor's money was paid into the account corresponding to the fund offering to which that investor was investing. For example, an investment in Woodbridge's second mortgage investment fund was deposited directly into the "Woodbridge Mortgage Investment Fund 2 LLC" account. The Woodbridge investment fund was supposed to lend that money to third-party borrowers, who would then make principal and interest payments back to the investment fund.  The difference between the interest rate charged to borrowers and the interest rate paid to investors would create income.  The fund would use a portion of this income for operating expenses, with the remaining income distributed as profits to investors from the fund accounts.  All of this activity—investor money in, loans to borrowers out, borrower payments in, operating expenses and investor profit out— should have occurred within the investment fund account.

80.     Instead of keeping this activity within the individual funds, Woodbridge swept investor money (and comparatively small amounts of income the fund made from legitimate borrowers) into its operating account.  For example, in August 2014, Woodbridge Mortgage Investment Fund 2 received $13,756,700.82 in investor money. $13.63 million was swept out that month.  In July 2015, Woodbridge Investment Fund 3 received $14,510,295.09 in investor money, with $15.1 million swept out. Woodbridge would also sometimes transfer money commingled in the operating account back to the fund accounts to supplement payments to investors.

81.     This unusual account activity occurred at a high volume on a monthly basis, throughout all investment accounts, from 2012 to 2017.  In total, more than $1.3 billion in transfers from the investment fund accounts were commingled in Woodbridge's operating accounts, with more than $220 million transferred back to the fund accounts—a pattern in direct conflict with Woodbridge's business model.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

82.     This commingling of funds occurred on a daily basis and was observed by Comerica's BSA monitor and its Studio City branch manager.

83.     As a further example of banking activity that conflicted with Woodbridge's business model, although one would expect to see a regular flow of mortgage interest payments from borrowers reflected in Woodbridge's bank accounts, the accounts took in only minimal cash from actual borrowers.  Comerica processed the incoming interest payments and accordingly knew that only a limited number of borrowers were making interest payments to Woodbridge.  *None of the Shapiro-affiliated entities that had received loans was paying any interest*.  Moreover, Comerica knew that the incoming interest payments to Woodbridge that it was processing did not come close to matching Woodbridge's committed outlays and purported business operations.

84.     Although Woodbridge raised at least $1.22 billion from investors, most of which was allegedly secured by third-party mortgage loans, it issued only $675 million in such loans.  And, instead of generating the substantial interest promised to investors, the loans generated only around $13.7 million from bona fide third-party borrowers— much less than required to operate Woodbridge's business and pay returns to the investors.

85.     A forensic accountant retained by the SEC examined Woodbridge's bank account records and found that the transactional activity in Woodbridge's Comerica accounts was not consistent with its purported business model.[2]

86.     The forensic analysis showed that as early as the third quarter of 2012, and continuing through September 2017, Woodbridge did not generate sufficient income and continuously ran at a cash-flow deficit, which by September 2017 had increased to $250 million.[3]  Comerica was aware of Woodbridge's long-term lack of profitability, and, as depositary for all of Woodbridge's revenues, Comerica saw that Woodbridge's real-estate business had no meaningful source of incoming cash apart from investor

---

[2] Declaration of Soneet R. Kapila, ¶¶ 76-78, *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla.), [Doc. # 36-2].
[3] *Id.* ¶¶ 86-88.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

funds.  Gaps in the company's funding were covered by large, one-time "bridge loans" from wealthy individuals Shapiro had personally solicited.  Shapiro deposited these cash infusions keeping Woodbridge afloat in newly opened accounts at Comerica bearing the phrase "Woodbridge Commercial Bridge Loan Fund."

87.   Woodbridge's ongoing unprofitability, coupled with its suspicious banking activity, which Comerica observed, constituted a red flag.

88.   Shapiro applied $368 million in new investor funds to pay existing investors out of Comerica accounts.

89.   Shapiro also applied investor funds in Comerica accounts to purchase almost 200 properties in the Los Angeles and Aspen areas for around $675 million. The net returns from those properties were nominal, with many remaining undeveloped, vacant lots.  On January 26, 2017, Shapiro emailed his chief securities salesman that "the numbers this month look awful due to lack of inventory," suggesting that Woodbridge "take money in with property pending."  The salesman complied. Comerica ignored Woodbridge's "awful" financial numbers and the fact that its intake of investor funds was not matched by corresponding real-estate development or lending to genuine counterparties.

90.   The number of Comerica accounts Shapiro opened for Woodbridge and its affiliated entities was alone suspect.  Woodbridge opened 23 Comerica accounts from 2012 to 2017, only seven of which were needed to perform Woodbridge's mortgage investment and commercial bridge loan activities.

**b.    Large, Round Dollar Transactions**

91.   The FFIEC BSA/AML Examination Manual also identifies as red flags those "fund transfers [that] are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

92.   Comerica's BSA monitor and its Studio City branch manager knew from monitoring and observing Woodbridge's accounts that the overwhelming majority of transfers between the operating accounts and investment fund accounts were in large,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

round dollar transactions—averaging in the *hundreds of thousands*.

93.     More than 99% of the more than $1.3 billion in transfers from investment fund accounts to operating accounts were made in round numbers that ended in "0.00," and averaged more than $550,000.  More than 87% of the more than $220 million transferred back to the investment funds was also sent in round numbers averaging nearly $250,000.

94.     The check amounts were round numbers, generally ranging from $25,000 to $300,000, drawn on accounts of many different individuals and entities across the country.

95.     Thus, not only did the size and frequency of the transfers and the comingling of funds raise red flags, their round-number denominations made those red flags even more apparent.

### c.     Pass-Through Accounts

96.     Shapiro's large-scale transferring and commingling of funds also relied on another highly characteristic feature of a Ponzi scheme: "pass-through" operating accounts that experienced millions or tens of millions in monthly activity but started and ended the month with similar balances.

97.     For example, in July 2014, a Woodbridge operating account began with a balance of approximately $517,000.  Although almost $23 million in receipts came in, the account ended the month with a balance of just $555,126.  In February 2016, that operating account started with less than $600,000 and saw *nearly $48 million* come through the account, yet ended with just $785,319.  And in August 2017, that operating account ended with a *negative balance* despite more than $45 million in receipts that month.

98.     This pass-through activity continued each month throughout the period in which Woodbridge perpetrated its fraud.  Such banking activity is generally viewed by banks and outside investigators as a primary characteristic of a Ponzi scheme or other large-scale fraud.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1

2

### d.    Suspiciously Large and Numerous Transactions with Attorney Trust Accounts

3      99.    Ponzi schemes commonly rely on attorney trust accounts to evade scrutiny

4  while commingling and misappropriating investor funds.

5      100.    Comerica observed unusual transactions involving attorney trust accounts

6  on numerous occasions but failed to take further action.  These red-flag transactions

7  were instrumental to Shapiro's fraud.  Woodbridge internally recorded the attorney trust

8  transfers as an increase in assets on the books of two separate Woodbridge entities,

9  resulting in a fraudulent, double counting of assets.  As compared to actual bank

10 records, Woodbridge overstated its assets by $790 million during the period from July

11 11, 2012, to April 28, 2017.

12      101.    As described in paragraphs 175 to176 below, on or around February 28,

13 2017, Comerica conducted a review of Woodbridge Group of Companies LLC

14 Operating Account #8192 for the period from February 22 to February 27, 2017.  A

15 Comerica analyst noted that ███████████████████████████████████████

16 ███████████████████████████████████████████████████████ .

17 The analyst noted that ████████████████████████████████████████

18 ███████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 ███████████████████████████████████████████████

22 █████████████████████████████ .

23      102.    Similarly, on or around August 31, 2017, a Comerica analyst conducted a

24 review of Woodbridge Group of Companies LLC Operating Account #8192 for the

25 period from May 16 to August 2, 2017, ████████████████████████████

26 ███████████████████████████████████████████████████ .

27 The review noted ████████████████████████████████████

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### e.  Suspicious Disbursements, Including Personal Expenditures of Investor Funds Deposited in Comerica Accounts

103.   Shapiro diverted investor funds from Woodbridge's Comerica accounts for such suspicious expenditures as $1.4 million on luxury retail purchases at stores like Chanel and Louis Vuitton, $1.6 million on home furnishings, $1.2 million in alimony to his ex-wife, $340,000 on luxury cars, and $400,000 on jewelry.

104.   The October 2014 account statement for Woodbridge Capital Investments shows a $53,750 wire to pay for a private jet membership.

105.   Some of Shapiro's personal expenditures were made directly out of corporate accounts.  Others were made using his wife's credit cards, and then Woodbridge investor funds were used to pay off those card balances.  Shapiro diverted investor funds to pay off approximately $9 million in credit card debt.

106.   Shapiro's wife and her company Schwartz Media received substantial investor proceeds from Woodbridge's Comerica accounts.

### f.  Other Facts Within Comerica's Knowledge

107.   Although Woodbridge was a billion-dollar enterprise, Shapiro was the sole signatory for all Woodbridge bank accounts.  And he insisted on hand-signing each and every check, whether to investors, sales agents, or others.  These arrangements were highly unusual.  An investment concern of Woodbridge's size normally employs a management structure with multiple executives and account signatories.

108.   Woodbridge's bookkeeping system also was not calibrated to its large-scale fundraising activities.  Instead of retaining external auditors, Woodbridge relied on controller Nina Pedersen, who worked from her home in Florida and was not a certified public accountant.

109.   Further, Comerica knew that Shapiro and Woodbridge were never licensed by the SEC to sell securities.  Non-licensure is a hallmark of a Ponzi scheme, and a red flag for banks because it suggests efforts to evade regulatory scrutiny.  Comerica knew that Woodbridge was selling unlicensed investment products and, moreover, that state

24

authorities had sanctioned Shapiro and Woodbridge for violating securities laws.

**3.    Comerica's Fraud-Alert Systems Repeatedly Flagged Suspicious Transactions in Woodbridge Accounts, but Comerica Took No Action Against Woodbridge.**

**a.    Comerica Employed Multiple Systems to Alert It to Suspicious Activity Requiring Review of the Woodbridge Accounts.**

110.   For the duration of Shapiro's scheme, all federally regulated financial institutions, including Comerica, were required to comply with the requirements of the Bank Secrecy Act and its implementing regulations.

111.   Under the FFIEC Manual, previously referenced, financial institutions must: (a) institute a system of internal controls to ensure ongoing compliance with federal banking law: (b) provide independent testing of compliance; (c) designate an individual of individuals responsible for managing compliance (BSA compliance officer); and (d) train appropriate personnel.

112.   In addition, a bank "must have a BSA/AML compliance program commensurate with its respective BSA/AML risk profile."  That is, "[t]he level of sophistication of the internal controls should be commensurate with the size, structure, risks, and complexity of the bank."

113.   The cornerstone of a strong Bank Secrecy Act / Anti-Money Laundering compliance program is the adoption and implementation of comprehensive customer due diligence policies, procedures, and processes for all customers, particularly those who present a heightened risk for money laundering and other types of illegal activity. Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer.

114.   Banks such as Comerica and their personnel also must be able to identify and take appropriate action once put on notice of any of a series of money laundering

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

"red flags" set forth in the FFIEC Manual.  *See supra* ¶ 43.

115.   An effective customer due diligence program starts at account opening. Financial institutions should obtain information at account opening sufficient to develop an understanding of normal and expected activity for the customer's occupation or business operations.  When actual account activity is inconsistent with the account's expected activity that was established at account opening, explanations should be obtained and enhanced due diligence should be undertaken.

116.   As one of the 25 largest commercial financial holding companies in the United States, Comerica knew the regulatory requirements of the Bank Secrecy Act, particularly with regard to customer due diligence.

117.   During the relevant time period, Comerica employed a range of sophisticated investigative and monitoring tools to monitor and detect indicia of fraud, illegal transactions, and other suspicious activities.

118.   Comerica employed ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████ An alert generated by this system prompted review by Comerica specialists.

119.   The ███ system alert provided information that included event details such as ███████████████████████████████████████ ██████████████████.

120.   The information provided by the ██████████████ ███████████████████████████████████████████ ███████████████████████████ systems.

**i.**   ████████████

121.   Banks are in the unique position to detect certain financial frauds well before a fraud is discovered by the victims because the money generated by the fraud flows through the bank.  This is why regulatory agencies and law enforcement task banks and other financial institutions with the responsibility to monitor customer

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

activity.  When Comerica opened the Woodbridge accounts, it accepted the

responsibility to monitor them.

122.   Comerica's █████ system is a robust, multifunctional tool, which

executed ████████████████████████ that were designed to enable it

to meet its monitoring compliance responsibilities and manage risk.

123.   First, ███████ provided ██████████████████████████████

████████████████████████████████.  The █████████████ functions

timely alerted the bank when its customers or account holders had participated in

suspected illegal transactions and activities.

124.   Second, ███████ tracked ████████████████████████████

███████████████████████████████.  Information provided

included the ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████.

125.   Third, ████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████.

126.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

127.   Finally, ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1

2   ▮▮▮▮▮ .

3   128.  ▮▮▮▮▮

4

5

6   ▮▮▮▮▮ .

7          **ii.**   ▮▮▮▮▮

8   129.   Comerica also used the ▮▮▮▮▮

9

10

11

12

13

14

15

16

17   ▮▮▮▮▮ .

18          **iii.   Investigative Databases**

19   130.   Comprehensive due diligence to comply with monitoring responsibilities

20   requires investigation and research into a customer when that customer applies for an

21   account.  During the relevant time period, Comerica relied on several investigative

22   database sources, including ▮▮▮▮▮ .

23   131.   ▮▮▮▮▮

24

25

26

27   ▮▮▮▮▮ .

28   132.   ▮▮▮▮▮

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1
2
3
4
5
6
7
8
9
10
11
12 ▮▮▮▮▮▮▮.

13    133.   Comerica performed a ▮▮▮▮▮ search on Shapiro in May 2014.  That

14 search revealed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮.  Moreover, a ▮▮▮▮▮ search report on

16 Woodbridge Mortgage Investment Fund 3 LLC in September 2017 showed that ▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮.

19    134.   ▮▮▮▮▮▮▮▮▮▮▮▮, provides access to

20 the dockets of closed and pending federal criminal and civil cases.  Comerica uses

21 ▮▮▮ as an investigative tool to research civil or criminal cases against certain

22 customers.  A nationwide ▮▮▮ search would have revealed that Robert Shapiro

23 initiated voluntary chapter 7 bankruptcy proceedings in 1991.  *See In re Shapiro*, 128

24 B.R. 328 (Bankr. E.D.N.Y. 1991).  During those proceedings, Shapiro admitted to

25 transferring money overseas to hide it from creditors. The same proceedings also

26 revealed that Shapiro had several judgments entered against him, including a 1988

27 judgment in favor of European American Bank for $711,381; a 1990 judgment in favor

28 of Coreast Bank for $303,090; and a 1990 judgment in favor of Bank Hapoalim for

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

$481,027.

#### iv.     Other Systems

135.   During the relevant time period, Comerica also used other banking systems that flagged unusual activity in the Woodbridge accounts.

136.   ████████████████████████████████████
███████████████████████████████.

137.   ████████████████████████████████████████
████████████████████████████████.  They revealed
██████████████████████████████████████████████
████████████████████████████████.

138.   Comerica was alerted to various concerns and red flags with the Woodbridge accounts through ███████████████, acting in conjunction with ████████ various monitoring tools and investigative databases.

#### b.     Comerica Employed Multiple Systems to Alert It to Suspicious Activity Requiring Review of the Woodbridge Accounts.

139.   Comerica's internal monitoring systems were intended to, and did, alert Comerica to fraudulent activity in Woodbridge's accounts.  Comerica's systems generated hundreds of alert events connected to its Woodbridge accounts.  More than 100 alert events were triggered for Woodbridge accounts in 2016 and 2017 alone.

140.   Comerica analysts reviewed Woodbridge accounts in response to these alerts.  These reviews included evaluation of account activity in relation to Woodbridge's stated business model and public information searches for Shapiro, the Woodbridge entities, and other individuals and entities associated with Woodbridge accounts.  Even though documents produced by Comerica in the Woodbridge bankruptcy proceedings have been heavily redacted, they show account activity characteristic of a Ponzi scheme, including ████████████████████
████████████████████████████████.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███████████████████████████.

141.    Comerica analysts openly recognized and documented account activity characteristic of a Ponzi scheme, but Comerica never confronted Shapiro.  Analysts often stated that suspicious activity was consistent with the Woodbridge business model (which was a Ponzi scheme) without giving any explanation for why they were overlooking all the warnings that, in combination, signaled his business model was a Ponzi scheme.  Instead, to brush aside the warnings and continue business as usual, the analysts only gave a cursory account of Shapiro's business limited to brief quotations from Woodbridge marketing materials, which, as described above, did not match up with the actual activity in the Comerica accounts.  Comerica analysts also developed fanciful explanations for suspicious activity.  For example, one analyst explained a ████████████████████████████████████████████ ██████████████████████████████s—as possibly "due to the time of year." Comerica had not reason to think Woodbridge's operations were seasonal in nature.

142.    Knowledge of Woodbridge's Ponzi-type behavior was not limited to isolated analysts.  Reviews were escalated for approval before an alert could be closed out.  On at least one occasion, the decision to halt any further action on an alert came from Comerica Vice President and President of Community Banks ██████████.

143.    On or around April 23, 2014, a Comerica analyst conducted a review of Schwartz Media Buying Company account #0530 for the period of March 21 to April 21, 2014.  Schwartz Media was owned by Shapiro's wife, Jeri Shapiro.  The analyst observed that Schwartz Media ████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████.  The analyst also investigated the Woodbridge Structured Funding account (#7690) at that time and observed that ██

31

1 ███████████████████████████████████████████████████

2 ████████████     The next day, a Comerica analyst noted that account #7690 had also

3 █████████████ .

4       144.   On or around May 19, 2014, a Comerica analyst conducted further review

5 of accounts #7690 and #0530, along with another Woodbridge Structured Funding

6 account, #2482.  He noted that the ████████████████████████████████

7 ███████████████████████████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████████████

10 █████████████████████████████████████████████████

11 ██████████████████████████████████     The analyst

12 wrote, however, that ███████████████████████████████████

13 ████████████████████████████████████████████

14 ██████████████████████████     The review notes then quoted the Woodbridge

15 website verbatim:

16         Woodbridge Investments brings together an expert team

17         of financial professionals who are dedicated to serving

18         our client's needs.  It is our mission to educate our clients

19         on their financial options.  We help our clients decide for

20         themselves whether to sell their future payments from

21         structured settlements, annuities, and lottery winnings for

22         lump-sum cash payments.

23 No further analysis of the Woodbridge business model was provided, even though this

24 superficial quotation provides no facts or foundation to explain the suspicious related-

25 entity transfers that Comerica, as explained above, was obligated to scrutinize as a

26 significant red flag.

27       145.  On or around March 2, 2015, a Comerica analyst evaluated six Woodbridge

28 accounts, for which she noted that ███████████████████████████████ount

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████     A public database search for Shapiro, Riverdale,

5 and several Woodbridge entities found ███████████████████████████

6 ██████████████████████████████—but the reviewer concluded

7 that the information ████████████████████

8      146.  On or around February 5, 2016, an alert was triggered for the Woodbridge

9 Group of Companies LLC Operating Account (#8192) for ██████████████

10 ████████████████████████████████  Comerica then conducted a review for the period from November 25, 2015, to February

11 Comerica then conducted a review for the period from November 25, 2015, to February

12 4, 2016.  The reviewer noted ██████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ██████████████████████████████.  The Jon Freis Client

17 Trust account was used by Shapiro to effectuate the Woodbridge Ponzi scheme.

18 Peachtree Aviation is a private jet charter that was used by Shapiro and paid for through

19 the use of investor funds.  Up and Coming Capital was identified by SEC accountant

20 Soneet Kapila as an entity associated with Shapiro that received payments for Shapiro's

21 benefit.  The review also noted ██████████████████████████████.

22      147.  Even though the Comerica analyst observed that a ████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████

25 ████████████████████████████████████████

26 ██████████████████████████████  and no further review was

27 conducted.

28      148.  Another alert on the same account was triggered within a few days for the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

same account due to ████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████ As a result, a
further review was conducted on February 10 for the period from February 5 to 8.  A
Comerica analyst observed that ███████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
████████  No further review was conducted.

149.  On or around April 15, 2016, a review was conducted of the Woodbridge
Mortgage Investment Fund 3A LLC account #7897 triggered by alerts for ████████
████████████████████████████████████████████
██████████████████████████████████████████████
Although the review for the period of March 14 to April 14, 2016 noted ██████████
█████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████

150.  On or around June 2, 2016, reviews were conducted for six Woodbridge
accounts for the period February 22 to March 24, 2016 (Woodbridge Structured
Funding LLC account #7690), March 11 to April 11, 2016 (Woodbridge Structured
Funding LLC account #2482), February 22 to March 23 (Woodbridge Structured
Funding LLC Special Investor Holding Account #0472), and May 1 to 31, 2016
(Woodbridge Mortgage Investment Fund 1 LLC account #0647, Woodbridge Mortgage
Investment Fund 2 LLC account #3483, and Woodbridge Mortgage Investment Fund 3
LLC account #2992).

151.  A Comerica analyst conducted ███████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1 ███████████████████████████████████████████████

2 █████████████████████████████████████████████████

3 █████████████████████████████████████████████████

4 ████████████

5      152.  On or around July 28, 2016, a Comerica analyst observed that Comerica

6 had previously ██████████████████████████████████████████████

7 ███████████████████████████████████████

8      153.  On or around August 16, 2016, another analyst noted that a ████████████

9 █████████████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ████████████

12      154.  On or around August 17, 2016, a Comerica analyst recorded further notes

13 about Schwartz Media and the Woodbridge entities.  She observed that ████████████

14 █████████████████████████████████████████████████████

15 ████████████████████████████████ and that ██████████████████████

16 ██████████████████████████████████████

17      155.  Comerica conducted a transactional review of Schwartz Media account

18 #0530 for transactions greater than $1000 between January 1, 2015 and August 15,

19 2016.  The review noted ███████████████████████████████████████

20 ███████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 █████████████████████████████████████████████

23 █████████████████████████████████████

24      156.  The analyst noted that ███████████████████████████████████

25 ████████, including Woodbridge Structured Funding LLC (#7690), Woodbridge Group

26 of Companies LLC (#8192) and Woodbridge Structured Settlement Investments LLC

27 (account unspecified).  She concluded, however, that ██████████████████████████████

28 ██████████████████████████████████████████  She went on to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

note the 

157.  Later that day, the analyst noted that

158.  Records indicate that the case was closed based on instructions from

159.  On or around August 1, 2016, a Comerica analyst reviewed Woodbridge Mortgage Investment Fund 3 LLC operating account #2992 for the period from June 3 to July 28, 2016, after

The review noted that

, and the review noted that

.  The review also noted

160.  The review concluded that

161.  On or around August 12, 2016, a Comerica analyst conducted a review of

36

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

the Woodbridge Group of Companies LLC Operating Account #8192 for the period

from July 11 to August 11, 2016, after ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

The review observed ██████████████████████████████████████

██████████████████████████████████████████████████

████    The review noted that ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

162.  The review concluded that █████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

163.  Just three days later, on or about August 15, 2016, another review was

triggered for the Woodbridge Group of Companies LLC Operating Account #8192 due

to ███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████    The review was conducted for

the period from August 11 to 12, 2016.  A Comerica analyst ███████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

164.  On or around December 2, 2016, Comerica conducted an unspecified

investigation related to the Woodbridge accounts.  A Comerica analyst noted at the time

that █████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1 ███████████████████████████████████████████

2 ████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████ .

5      165.  A month later, on or around January 3, 2017, a Comerica analyst noted that

6 ██████████████████████████████████████████████

7 ███████████████████████████████████████████

8 ████████████████████████████

9      166.  On or around January 9, 2017, a Comerica analyst conducted a review of

10 the Woodbridge Mortgage Investment Fund 4 LLC account #2703 for the period from

11 December 5, 2016 to January 5, 2017, ████████████████████████████

12 ████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ████████████████████████████████ .  The review also noted ████

15 ██████████████████████████████████████

16 █████████████ The analyst escalated the review for further consideration.

17      167.  Another Comerica analyst dismissed the relevance ███████████

18 ████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ██████████████████████████████████████████████

21 ████████████████████████████████████████

22 ██████████████████████████████████████

23 █████████████████████████ No further action was taken.

24      168.  On or around January 17, 2017, a review was initiated for the Woodbridge

25 Group of Companies LLC Operating Account for the period from December 13, 2016

26 to January 13, 2017 after ████████████████████████████████████

27 █████████████████████████ A Comerica analyst noted that ████████

28 ████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1   ███████████████████████████████████████████████

2   ███████████████████████████████.  As noted above, the use of attorney

3   trust accounts to move and hold assets is a hallmark of Ponzi schemes.

4       169.  The Comerica analyst concluded that the activity was ███████████

5   ████████████████████████████████████████████████

6   █████████████████████████████████████████████████

7   ████████████████  No further action was taken.

8       170.  On or around January 19, 2017, ██████████████ of Comerica noted that

9   ████████████████████████████████████████████

10  ███████████████████████████████████████████

11  ████████████████████████████████████████████████

12  █████████████████████████████████████████████████

13  ███████████████████████████████████████████

14  ████████████  No further action was taken.  Again, the review did not explain how more

15  complicated account activity justified a less thorough investigation.

16      171.  On or around February 22, 2017, a Comerica analyst conducted a review of

17  Woodbridge Group of Companies LLC Operating Account #8192 for the period from

18  January 21, 2017 to February 21, 2017, after ████████████████████████

19  ██████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ██████████████████

22      172.  The review noted that ████████████████████████████████

23  ████████████████████████████████████████████████

24  █████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ███████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ██████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

173. 

174.  Another review of account #8192 was conducted almost immediately, on or around February 28, 2017, for the period from February 22 to February 27, 2017, after

A Comerica analyst noted that the

The analyst also noted that

. The review noted

175.  Without further consideration of the Woodbridge business model, the analyst recommended closing the review because

176.  On or around March 24, 2017, a Comerica analyst conducted a review of Woodbridge Mortgage Investment Fund 4 LLC account #2703 for the period from

40

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1   January 23 to March 23, 2017, after ███████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ███████████████████████████   The review included a description of

5   Woodbridge Structured Funding that appears to have been taken from marketing

6   materials:

> Woodbridge Structured Funding, LLC is a leader in the
> structured funding industry.  Over twenty years ago, we
> innovated the purchase of future payments in return for a
> lump-sum.  Today, there are many companies out there
> looking to purchase structured settlements, annuities and
> lottery winnings, but Woodbridge Structured Funding
> LLC was there at the start!

> Since 1993, Woodbridge Structured Funding, LLC, its
> predecessor companies and founders have helped
> thousands of people with their lottery winnings, jackpots,
> structured settlements and annuities — one satisfied
> customer at a time.  As a founder of our industry with a
> proven track record of success, Woodbridge Investments
> has turned heads on Wall Street and Main Street.

22   177.  The review noted ██████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ███████████████████████████████████.

26   178.  The Comerica analyst concluded that ██████████████████████

27   ████████████████████████████████████████████████████████

28   ██████████████████████████████████   No explanation was

41

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

attempted for why the time of year would affect account activity in Woodbridge accounts.  Moreover, Woodbridge Mortgage Investment Fund 4, LLC had nothing to do with Woodbridge's structured funding activities.

179.  On or around August 31, 2017, a Comerica analyst conducted a review of Woodbridge Group of Companies LLC Operating Account #8192 for the period from May 16 to August 2, 2017, after ███████████████████████████████████ ████████████████████████████████ The analyst noted that ████████████████████████████████████████████ ███████████████████████

180.  The review noted ██████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████

████████  Joy Gravenhorst is identified in SEC account Soneet Kapila's declaration as a recipient of payments made for the benefit of Shapiro.  The analyst went on to observe that ███████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████

181.  According to the analyst, ██████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████  While the document is redacted, there is no indication Comerica took any further action on the review.

182.  Even while numerous alerts informed Comerica of a pattern of activity with no non-fraudulent explanation, Comerica declined to stop the activity and close the accounts, as is required under banking industry standards and by the FFIEC Manual. Instead, Comerica chose to not even question Shapiro, and continued to provide him unrestricted banking services and allow him unfettered access to investor funds.

42

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

C.    **The Fraud Emerges**

      1.    **Shapiro's Earlier Business Ventures**

183.   Woodbridge offering materials made no mention of Shapiro's history of failed investment schemes.  Unbeknownst to investors, the Woodbridge Ponzi scheme was consistent with a pattern of unscrupulous conduct going back to the 1980s.

184.   In 1990, Shapiro founded Dunewood Funding Corporation, a real-estate investment enterprise structured similarly to Woodbridge.  Promising a high rate of return, Shapiro solicited investors to deposit money into an escrow account that would supposedly be used to purchase mortgages titled in the investors' names.  Instead, Shapiro stole the money.

185.   In 1991, Shapiro entered involuntary Chapter 7 bankruptcy.  Several Dunewood creditors pursued claims.  *See In re Shapiro*, 128 B.R. 328 (Bankr. E.D.N.Y. 1991).  During the bankruptcy proceedings, Shapiro admitted to diverting money for personal use and transferring money overseas to hide it from creditors.

186.   Dunewood investors also brought claims against the escrow agent for fraud, negligent misrepresentation, and breach of contract.  *See Solondz v. Barash*, 225 A.D.2d 996 (N.Y. App. Div. 1996) (affirming in part, and reversing in part, denial of motion for summary judgment).

187.   Shapiro has had several judgments entered against him, such as a 1988 judgment in favor of the European American Bank for $711,397, a 1990 judgment in favor of Coreast Savings Bank for $303,090, and another 1990 judgment in favor of Bank Hapoalim for $481,027.  Further, Shapiro has been pursued and penalized by federal and state tax authorities, who imposed liens on his properties between 1995 and 2004—including eight federal tax liens that the Internal Revenue Service placed, and four state tax liens that the New York State Tax Commission placed, on Shapiro-owned properties.

188.   Shapiro's checkered past of fraud allegations, bankruptcy, adverse judgments, and tax liens involved precisely the type of customer information that

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

Comerica obtains through standard due diligence and monitoring and investigation tools. In August 2011, Comerica obtained a report using ███████████ that showed Shapiro was the president of Dunewood.  The report included six-and-a-half pages of records of judgments and liens by the Internal Revenue Service, California, and New York from 1992 to 2010—the year before the report was generated.

189.   At no point, however, did these facts lead Comerica to reconsider its view of Shapiro and Woodbridge as desirable clients or cause Comerica to stop providing services to Woodbridge.  Instead, Comerica continuously maintained its relationship with Shapiro and Woodbridge despite knowing the extensive adverse judgments and liens, and even though the Woodbridge business model mirrored the Dunewood model Shapiro had previously employed to fraudulently obtain and misappropriate funds from investors.

### 2.  State Proceedings

190.   Beginning in 2015, Shapiro and Woodbridge came under increasing scrutiny and censure by both state and federal regulatory authorities.

191.   Woodbridge and its affiliated entities were the subject of 25 information requests from state regulators.  Five regulators—in Texas, Massachusetts, Arizona, Pennsylvania, and Michigan—issued cease-and-desist or consent orders based on Woodbridge's securities fraud and sales of unregistered securities.  Before its demise, proceedings were initiated by state regulators in Arizona, Colorado, Idaho, and Michigan against Woodbridge entities.

192.   Woodbridge entered into consent decrees or received cease-and-desist orders demonstrating that Woodbridge was operating an illegal investment scheme. Public filings in Massachusetts, Texas, Arizona, Pennsylvania, and Michigan exposed Woodbridge's unorthodox and unlawful business practices.

193.   The state regulatory agencies that issued the cease-and-desist and consent orders made them available to the public through their respective websites.  Comerica's internal systems are designed to identify regulatory actions against customers.  In August

44

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    2016, Comerica analysts, using a tool called ███████████████████████

2    ██████████████████████████████████████████████████████████████████.

3    Still, Comerica continued providing services to Woodbridge and maintained its view of

4    Shapiro as a desirable client.  Separately, the Texas Securities Commission employee

5    emailed a press release directly to Comerica to notify it of regulatory sanctions entered

6    against Woodbridge in Texas and Massachusetts.

7                      **a.    Massachusetts**

8         194.   On May 4, 2015, the Massachusetts Securities Division entered into a

9    consent order with Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge

10   Mortgage Investment Fund 2, LLC, and Woodbridge Mortgage Investment Fund 3,

11   LLC.

12        195.   Massachusetts charged that (1) Woodbridge failed to register the FPCM

13   notes as securities as required by law; (2) Woodbridge did not maintain separate

14   financial accounts for each Massachusetts investor, or a separate fund or pool, for

15   payment of the obligations to each Massachusetts investor, instead paying investors

16   from general corporate accounts; (3) investors relied on Woodbridge to properly value

17   the property serving as collateral on the loan, including its potential for depreciation, to

18   file the Massachusetts investor's security interest on local land records, and to obtain

19   title insurance on the property; and (4) "[i]n cases where the property does not

20   adequately collateralize the loan made by Woodbridge, Massachusetts Investors will

21   have to rely on Woodbridge to maintain liquid cash reserves to continue making interest

22   and principal payments despite possible loss in the value of collateral."

23        196.   By operation of the Massachusetts consent order, Woodbridge was to cease

24   and desist selling unregistered securities in the state, was censured by the Massachusetts

25   Securities Division, rescinded the FPCM agreements with Massachusetts investors and

26   returned their principal investments, and agreed to pay the Commonwealth of

27   Massachusetts a $250,000 civil penalty.

28

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

### b.   Texas

197.   On July 17, 2015, the Texas State Securities Board issued an emergency cease-and-desist order against Shapiro and Woodbridge Mortgage Investment Fund 3, LLC, among other entities.

198.   Texas entered the following findings of fact: (1) Shapiro controlled Woodbridge; (2) the FPCM notes were not registered for sale as securities in Texas; (3) the brokers selling the FPCM notes in Texas were not registered; (4) Woodbridge and Shapiro did not take reasonable steps to verify that all of its purchasers were accredited investors; (5) Woodbridge and Shapiro failed to disclose Woodbridge's assets, liabilities, and other financial data relevant to Woodbridge's ability to pay investor returns and ultimately principal; (6) Woodbridge failed to disclose how investor funds would be held while Woodbridge attempted to raise sufficient money to fund the commercial loans; (7) Woodbridge failed to disclose the risks associated with the FPCM notes; and (8) Woodbridge failed to disclose that it had entered into a consent order with the Massachusetts Securities Division.

199.   Texas concluded that Woodbridge and Shapiro violated state law by offering unregistered securities for sale and committing fraud in connection with the offer for sale of securities.  The Texas State Securities Board accordingly ordered Woodbridge and Shapiro to stop selling the FPCM notes in Texas and to stop committing fraud in connection with the sale of the FPCM notes in Texas.

200.   On July 22, 2015, the Texas State Securities Board emailed its news release *directly to an assistant vice president of compliance at Comerica*.  The news release noted that Massachusetts regulators earlier that year had sanctioned Woodbridge for violating securities laws and ordered it to pay a $250,000 civil penalty.

### c.   Arizona

201.   On October 4, 2016, the Securities Division of the Arizona Corporation Commission instituted cease-and-desist proceedings against Shapiro and several Woodbridge affiliates.

46

202.   Arizona charged that: (1) Shapiro controlled the Woodbridge funds; (2) if the real estate did not adequately capitalize the loans, the Woodbridge funds might not have enough liquid cash reserve to continue making investor payments; (3) investor security interests might be invalidated by the Woodbridge funds' failure to perfect the security interests; (4) the Woodbridge funds sold the FPCM notes through unregistered sales agents; (5) Woodbridge falsely told investors that "Woodbridge and its predecessors have never been found to have violated any securities law"; (6) Woodbridge sold unregistered securities in the state of Arizona, using unregistered sales agents, both in violation of Arizona law; and (7) Woodbridge committed securities fraud by failing to disclose the Massachusetts and Texas consent decrees.

### d.   Pennsylvania

203.   On April 24, 2017, the Commonwealth of Pennsylvania Department of Banking and Securities issued an order concluding that Woodbridge violated the Pennsylvania Securities Act of 1972 by offering securities through unregistered sales agents.

204.   Instead of defending itself in litigation, Woodbridge entered into a consent decree with Pennsylvania regulators under which it was required to pay a $30,000 fine.

### e.   Michigan

205.   On August 8, 2017, Michigan's Department of Licensing and Regulatory Affairs issued a cease-and-desist order prohibiting Woodbridge from offering or selling unregistered securities in the state or omitting material facts in connection with the sale of securities.

206.   Following its investigation, Michigan found: (1) the FPCM notes were unregistered securities; and (2) Woodbridge described the FPCM notes as safe and low-risk, but did not provide financial information to demonstrate its ability to pay promised returns or disclose to investors that it was the subject of several cease-and-desist orders.

207.   Michigan ordered Woodbridge to cease and desist selling unregistered securities in the state and imposed a civil fine of $500,000.

47

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

208. Comerica continued to service Woodbridge despite knowing from the information it received about state enforcement proceedings that Woodbridge was engaged in an ongoing securities fraud.

### 3. Federal Proceedings

#### a. The SEC's Enforcement Actions

209. By September 2016, the SEC had begun investigating Shapiro and Woodbridge. The SEC's investigation focused on Woodbridge's unregistered sale of securities and whether it was "operating a fraud on its investors."

210. Woodbridge refused to cooperate with the SEC investigation. The SEC consequently brought two separate enforcement actions, one of which resulted in a motion for civil contempt.

211. Comerica knew about both SEC enforcement actions. On September 22, 2017, a vice president of compliance at Comerica received an SEC email bulletin regarding the first action with the header "Court Orders Woodbridge Group of Companies LLC to Produce Documents to SEC."

212. On November 2, 2017, the same Comerica employee received a second SEC email bulletin concerning the subpoena enforcement against Woodbridge and its related shell companies that stated, "SEC Seeks Order Against 235 Entities Affiliated with Woodbridge Group of Companies, LLC to Produce Documents to SEC." Comerica continued to service Woodbridge in the face of the SEC investigation.

213. Shapiro, Woodbridge's controller Nina Pedersen and the principal Woodbridge securities salesman refused to answer any questions at their SEC depositions in late 2017, instead invoking their rights against self-incrimination under the Fifth Amendment.

214. On December 20, 2017, the SEC filed a civil complaint for injunctive and other relief in the Southern District of Florida charging that Shapiro ran a "massive Ponzi scheme," commingled investor funds, paid existing investors with money garnered from new investors, and misappropriated millions of dollars to "live[] in the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

lap of luxury . . . spen[ding] exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine, and chartering private planes."[4]

215.   The SEC alleged that "Woodbridge's business model was a sham"—instead of paying investor returns with interest obtained from legitimate third-party mortgages, Woodbridge and Shapiro aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

216.   The district court acted immediately on the SEC's emergency ex parte motion for a temporary asset freeze and a sworn accounting of all Woodbridge accounts, granting the motion on December 20, 2017, and "find[ing] good cause to believe that unless immediately restrained and enjoined . . . Defendants Shapiro [and a series of Shapiro affiliates] will continue to dissipate, conceal or transfer . . . assets that are likely subject to an Order of disgorgement."

217.   On December 27, 2018, the district court entered final judgments against the Woodbridge entities, Shapiro, and other related parties.  The Woodbridge entities were ordered to pay $892 million in disgorgement.  Shapiro was ordered to pay $100 million in civil penalties and more than $20 million in disgorgement and prejudgment interest.  There is no indication that Shapiro has the ability to make the court-ordered payments.

### b.   Woodbridge's Bankruptcy

218.   On December 4, 2017, Woodbridge declared bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

219.   On February 15, 2019, a chapter 11 plan became effective.

220.   Under the terms of the plan, the Woodbridge Liquidation Trust was formed to pursue, hold and administer the liquidation trust assets and to make distributions to the Trust beneficiaries.

---

[4] *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla. filed Dec. 20, 2017).

49

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

221.   The plan provides for the vesting of all assets of Woodbridge debtors in the Woodbridge Liquidation Trust (or one of its direct or indirect subsidiaries) and for the dissolution of all such debtors other than Woodbridge Group of Companies, LLC and Woodbridge Mortgage Investment Fund 1, LLC.

222.   The assets of the Trust also include claims held by investors who elected to contribute to the Trust all causes of action relating to the Woodbridge entities, including the causes of action asserted against Comerica in this complaint.

223.   A substantial number of Woodbridge investors assigned their claims against Comerica to the Trust.  The Liquidation Trust is a member of the proposed class in this action.

### c.  The Federal Criminal Prosecutions

224.   On April 5, 2019, the United States Attorney for the Southern District of Florida indicted Shapiro and two Woodbridge sales operatives on charges including mail fraud, wire fraud, conspiracy to commit mail fraud and wire fraud, conspiracy to commit money laundering, and income tax evasion.

225.   Funds wired from investors to Woodbridge accounts at Comerica formed the basis for the wire fraud counts in the indictment.  The government in part based its mail fraud counts upon checks that investors mailed to Woodbridge, which deposited them into its accounts at Comerica.

226.   On April 11, 2019, agents of the Federal Bureau of Investigation and the Internal Revenue Service arrested Shapiro at his residence in Sherman Oaks, California. On August 5, 2019, Shapiro entered into an agreement to plead guilty to one count of conspiracy to commit mail fraud and wire fraud and one count of evasion of payment of federal income taxes.

227.   The prosecutions of the sales operatives are pending.

## VI.   TOLLING OF THE STATUTES OF LIMITATIONS

228.   Comerica, aware of the illegal Woodbridge scheme and its injurious effects, fraudulently concealed the scheme, including by continuing to execute the account

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    transactions that were its lifeblood.

2        229.   Comerica, Woodbridge, and Shapiro fraudulently concealed from Plaintiffs

3    that the overwhelming majority of FPCMs and Fund Offerings were not secured by

4    loans to holders of commercial real estate, that returns on FPCMs and Fund Offerings

5    would be paid from similar investments, and only on condition that those future

6    transactions occur, rather than from interest payments on the sham third-party loans

7    described in the offering materials, that Shapiro was embezzling millions of dollars in

8    investor funds for his own personal use and enjoyment, that Woodbridge and Shapiro

9    had unlawfully failed to register the FPCMs and Fund Offerings with government

10   regulators, and that Woodbridge and Shapiro had entered into several consent decrees

11   with governmental regulators requiring them to stop violating the law.

12       230.   Comerica, Woodbridge, and Shapiro were aware that Plaintiffs and class

13   members did not know about the Woodbridge investment fraud.  Comerica,

14   Woodbridge, and Shapiro had superior and exclusive knowledge of that fraud.  Despite

15   reasonable diligence on their part, Plaintiffs were kept ignorant by Comerica,

16   Woodbridge, and Shapiro of the factual bases for these claims for relief.

17       231.   The FPCM and Fund Offering sales materials contained misstatements

18   designed to entice Plaintiffs to purchase "safe" and "secured" investments with returns

19   generated by third-party borrowers' interest payments.  These fraudulent

20   misrepresentations had the effect of concealing that Woodbridge was, in fact, using

21   primarily new investor funds to fund existing investors' returns.

22       232.   Plaintiffs did not discover, and exercising reasonable diligence could not

23   have discovered, the facts establishing Comerica's violations or the harm caused thereby

24   until the Woodbridge entities declared bankruptcy and the SEC filed its enforcement

25   action in December 2017.  Plaintiffs learned of the relevant actions of Comerica,

26   Woodbridge, and Shapiro through the bankruptcy and SEC actions and their coverage in

27   the press.  Only then did Plaintiffs retain counsel to vindicate their rights, and even then

28   Comerica redacted large portions of the documents it made public.  Because Plaintiffs

and class members could not have reasonably discovered the facts constituting Comerica's violations until December 2017, all applicable statutes of limitation were tolled until then.

## VII.   CLASS ACTION ALLEGATIONS

233.   Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who from July 1, 2012 through December 1, 2017 invested in Woodbridge FPCM promissory notes or Woodbridge units.

234.   Excluded from the class are Comerica, its parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Comerica has a controlling interest or which has a controlling interest in Comerica, and the Relevant Non-Parties.  Also excluded from the class are the judicial officers to whom this matter is assigned and their staff and immediate family members.

235.   <u>Numerosity</u>.  The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Comerica or the Relevant Non-Parties.  Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

236.   <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of other members of the class.  Plaintiffs and each class member invested in Woodbridge investments at issue and were subject to the wrongful conduct alleged in this complaint.

237.   <u>Adequacy of Representation</u>.  Plaintiffs are members of the class and will fairly and adequately represent and protect its interests.  Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

238.   Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

239.   <u>Commonality and Predominance</u>.  Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

individual class members.  Among the questions common to the class are:

a. Whether Shapiro and Woodbridge committed fraud and/or breached duties to Plaintiffs and members of the class;

b. Whether Comerica aided and abetted, joined, and/or participated in Shapiro's and Woodbridge's fraud and/or breach of duties;

c. Whether Comerica knowingly carried out transactions in furtherance of the Woodbridge Ponzi scheme despite atypical banking activity and other red flags indicating that Shapiro and Woodbridge were committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

d. Whether Comerica's conduct alleged herein violates the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and

e. Whether, in view of their investment losses, Plaintiffs and class members are entitled to damages or restitution.

240. <u>Superiority</u>.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Although each class member paid thousands to dollars to invest in the relevant Woodbridge investments, the cost of litigation will be high.  The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions.  Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.  Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.  Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

**VIII. CLAIMS FOR RELIEF**

## COUNT 1

### Aiding and Abetting Fraud

241. Plaintiffs incorporate the foregoing allegations by reference.

242.   As set forth more fully above, Shapiro and Woodbridge perpetrated fraud on the investing public through a series of materially false and misleading statements and omissions.  Among other fraudulent conduct, Shapiro and Woodbridge (i) misrepresented the security of the FPCM and Fund Offering investments; (ii) represented that these investments would fund loans to bona fide third parties when, in fact, the vast majority of the purported third-party borrowers were LLCs owned and controlled by Shapiro that lacked an income source and never made loan payments; (iii) failed to disclose to investors that Woodbridge issued only $675 million of the $1.22 billion raised in loans; (iv) concealed from investors that Woodbridge was operating as a Ponzi scheme by, among other illegal acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and (v) concealed from investors that Shapiro misappropriated and misused millions of dollars in investor funds for improper purposes, like financing personal luxuries.

243.   Comerica knew that Shapiro and Woodbridge perpetrated fraud on investors, including Plaintiffs and the class.

244.   Comerica knowingly and substantially assisted Shapiro and Woodbridge in unlawfully defrauding Plaintiffs and the class, in at least the following respects:

a.   Acting in furtherance of the Woodbridge Ponzi scheme, including by approving thousands of transfers of funds between Woodbridge accounts, despite identifying regulatory and compliance "red flags" discussed above;

b.   Commingling money invested by Woodbridge promissory note holders and purchasers of fund offering units;

c.   Executing and condoning atypical banking procedures to service Shapiro's complex series of accounts;

d.   Concocting pretextual explanations to justify dismissal, without further investigation, of thousands of account alerts generated by Comerica's electronic monitoring systems in connection with the Woodbridge accounts;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

e.     Permitting Shapiro to loot Woodbridge operating accounts for personal expenditures and repayment of personal debt;

f.     Accepting for deposit funds derived from the sale of unregistered securities;

g.     Carrying out improper and atypical financial transactions such as the transfer of approximately $1.66 billion via nearly 11,000 account transactions; and

h.     Continuing to service Woodbridge accounts after five state regulatory agencies determined that Shapiro was engaged in unlawful conduct and served him with cease-and-desist or consent orders.

245.   In connection with providing substantial and material assistance to Shapiro and Woodbridge, Comerica was aware of its role in the Woodbridge Ponzi scheme and acted knowingly in assisting Shapiro and Woodbridge.

246.   Comerica substantially benefited from its participation in the Woodbridge Ponzi scheme.  The scheme caused Comerica to earn income from fees and from investing capital derived from Woodbridge investors.

247.   As a direct and proximate result of Comerica's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 2

### Aiding and Abetting Breach of Fiduciary Duty

248.   Plaintiffs incorporate the foregoing allegations by reference.

249.   At all relevant times, Shapiro was the CEO of Woodbridge.

250.   At all relevant times, Shapiro maintained complete or substantially complete control over the Woodbridge Group of Companies and each of the Woodbridge investment funds.  Shapiro had complete control, and was the sole signatory for, the Comerica bank accounts in which investor funds were deposited.  Shapiro also wrote investors personally, characterizing collateral as "senior" and promising them satisfactory returns.

251.   By reason of his controlling positions, actions, and direct and indirect

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

representations to Plaintiffs and class members, and by reason of the investors having deposited funds into Shapiro's control with the understanding he would act in accordance with his promises in regard to the use of such funds, Shapiro owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.  By selling Plaintiffs and class members promissory notes and fund offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, and otherwise acting as alleged herein in violation of his fiduciary duties to investors, Shapiro breached fiduciary duties he owed to Plaintiffs and class members.

252.   Based on its knowledge of Woodbridge's business model and banking activity, Comerica knew that Woodbridge and Shapiro owed fiduciary duties to investors, including Plaintiffs and the class.

253.   As demonstrated by the facts stated herein, Comerica substantially assisted Shapiro's breaches of fiduciary duty with knowledge that Shapiro was breaching those duties.  Shapiro's breaches of fiduciary duty were enabled by and would not have been possible but for Comerica's actions and inaction.

254.   As a direct and proximate result of Comerica's aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 3

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

255.   Plaintiffs incorporate the foregoing allegations by reference.

256.   Plaintiffs lack an adequate remedy at law.

257.   The UCL forbids any unlawful, unfair, or fraudulent business act or practice.

258.   Comerica's conduct is unlawful because Comerica violated applicable Bank Secrecy Act and anti-money laundering regulations, including those requiring implementation of a program to ensure adequate due diligence of banking customers

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

and their account activity.  Plaintiffs do not premise their claims under the UCL on
whether Comerica filed or failed to file a SAR in connection with Woodbridge banking
activity.

259.   Comerica's conduct also is unfair in violation of the UCL by reason of its
unscrupulous, oppressive, and substantially injurious actions and inaction.  Among
other unfair conduct, Comerica:

a.   Acted in furtherance of the Woodbridge fraud, including by
executing thousands of transfers between related accounts and by commingling investor
funds;

b.   Knowingly facilitated Shapiro's misappropriation and misuse of
investor funds;

c.   Continued to aid Woodbridge in defrauding investors, and failing to
take corrective action, in response to the panoply of other irregular banking activities
detailed above, many of which Comerica noted as a result of electronic alerts but
pretextually explained away;

d.   Continued to aid Woodbridge in defrauding investors, and failing to
take corrective action, after issuance and publication of the state cease-and-desist and
consent orders recognizing Woodbridge's violations, including of laws that prohibit
defrauding investors; and

e.   Failed to implement and adhere to mandatory Bank Secrecy Act and
anti-money laundering protocols, including those requiring the implementation of
adequate due diligence programs.

260.   The gravity of the harm resulting from Comerica's unfair conduct outweighs
any potential utility of the conduct.  Comerica's failure to take appropriate and necessary
steps to protect investors, even in the face of several cease-and-desist and consent
orders, and despite hundreds of suspicious account activity alerts generated by its own
electronic monitoring systems, harms the public at large and forms part of a common
and uniform course of wrongful conduct.  There are reasonably available alternatives

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    that would have furthered Comerica's business interests, such as declining to service

2    Woodbridge's banking business or insisting that all relevant facts be disclosed to

3    investors.

4        261.   The harm from Comerica's unfair conduct was not reasonably avoidable by

5    investors.

6        262.   Plaintiffs and the class suffered injury in fact, and lost money or property, as

7    a direct and proximate result of Comerica's unlawful and unfair conduct.  Plaintiffs

8    accordingly seek restitution as provided for under Cal. Bus. & Prof. Code § 17203, in

9    addition to reasonable attorneys' fees and costs.

10                               **PRAYER FOR RELIEF**

11       WHEREFORE, Plaintiffs respectfully pray for a judgment:

12           A.    Certifying this action as a class action pursuant to Federal Rule of

13    Civil Procedure 23(b)(2) and (b)(3);

14           B.    Appointing Plaintiffs as class representatives and Interim Lead Class

15    Counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

16           C.    Awarding damages or restitution, including pre-judgment interest, on

17    each Count in an amount to be determined at trial;

18           D.    Entering temporary, preliminary, or permanent injunctive relief

19    and/or imposing a constructive trust;

20           E.    Awarding reasonable attorneys' fees and costs of litigation; and,

21           F.    Granting such other relief as the Court may deem just and proper.

22                              **DEMAND FOR JURY TRIAL**

23       Plaintiffs request a jury trial for any counts for which a trial by jury is permitted

24    by law.

25

26

27

28

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1    Respectfully submitted,

2    Dated: August 26, 2020        By: ___/s/ *Daniel C. Girard*

3    Daniel C. Girard
4    Jordan Elias
     Trevor T. Tan
5    Makenna Cox
6    **GIRARD SHARP LLP**
     601 California Street, Suite 1400
7    San Francisco, California 94108
8    415.981.4800
     dgirard@girardsharp.com
9    jelias@girardsharp.com
10   ttan@girardsharp.com
     mcox@girardsharp.com
11

12   *Interim Lead Class Counsel*

13

14   **BERGER MONTAGUE, P.C.**
     Michael C. Dell'Angelo
15   Barbara A. Podell
16   1818 Market Street, Suite 3600
     Philadelphia, PA 19103
17   215-875-3000
     mdellangelo@bm.net
18   bpodell@bm.net
19

20   **COHEN MILSTEIN SELLERS &
     TOLL PLLC**
21   Steven J. Toll
22   1100 New York Avenue N.W., Suite 500
     Washington, DC 20005
23   Telephone: 202.408.4600
24   Email: stoll@cohenmilstein.com

25   **KOZYAK TROPIN &
26   THROCKMORTON**
     Harley S. Tropin
27   2525 Ponce de Leon Blvd., 9 Fl.
28   Miami, FL 33134

59

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: 305.372.1800
Email: hst@kttlaw.com
(Subject to Court Approval)

**LEVINE KELLOGG LEHMAN
SCHNEIDER & GROSSMAN LLP**
Jeffrey C. Schneider
Lawrence A. Kellogg
Jason Kellogg
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Email: jcs@lklsg.com
Email: lak@lklsg.com
Email: jk@lklsg.com

**SONN LAW GROUP PA**
Jeffrey R. Sonn, Esq.
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Tel: (305) 912-3000
Email: jsonn@sonnlaw.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Betsy C. Manifold
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619.239.4599
Email: manifold@whafh.com

*Plaintiffs' Executive Committee*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)

1

## **CERTIFICATE OF SERVICE**

I, Daniel C. Girard, hereby certify that on August 26, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will serve notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document upon confirmation of efiling.

I also certify that I caused the under-seal document to be emailed to counsel.

By: _____*Daniel C. Girard*_____

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:18-cv-00103-DMG (MRWx)