Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
ttan@girardsharp.com
mcox@girardsharp.com

Interim Lead Class Counsel

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| IN RE WOODBRIDGE INVESTMENTS LITIGATION | Case No. 2:18-CV-00103-DMG (MRWx)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>REDACTED VERSION FILED UNDER SEAL PURSUANT TO ORDERS OF OCTOBER 1 AND DECEMBER 5, 2019 [DOC. # 89, 118]; REDACTED VERSION SOUGHT TO BE SEALED<br><br>Date: June 25, 2021<br>Time: 10:00 a.m.<br>Courtroom: 8C, Eighth Floor<br>Judge: Honorable Dolly M. Gee |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................ vviii

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF FACTS ....................................................... 2

      A.    Plaintiffs Invested in the Woodbridge Ponzi Scheme. ....................... 2

      B.    Comerica Knew of and Acted in Furtherance of the Woodbridge Fraud. ................................................................................. 3

III.  PROCEDURAL BACKGROUND ............................................... 10

IV.   LEGAL STANDARD .......................................................... 12

V.    ARGUMENT ................................................................. 12

      A.    The Prerequisites of Rule 23(a) Are Met. .............................. 13

            1.    The Class is Sufficiently Numerous to Make Joinder Impracticable. .................................................. 13

            2.    Plaintiffs' Claims Involve Common Issues of Fact and Law. ............................................................. 133

            3.    Plaintiffs' Claims Are Typical of the Class. .................... 144

            4.    Plaintiffs and Their Counsel Will Adequately Represent the Class. .................................................... 155

      B.    The Requirements of Rule 23(b)(3) Are Satisfied. ..................... 166

            1.    Common Issues Predominate in Plaintiffs' Claims. ........... 16

                  a.    California Law Applies to Plaintiffs' Claims Against Comerica Arising Out of Its Relationship with Woodbridge. ........................................ 17

                  b.    Common Questions Predominate. ...................... 20

                  c.    Individual Damage Determinations Do Not Defeat Predominance. .......................................... 24

            2.    A Class Action Is the Superior Means of Resolving This Controversy. ................................................ 244

VI.   CONCLUSION ............................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Abogados v. AT&T, Inc.*
   223 F.3d 932 (9th Cir. 2000).................................................................. 18

*Ades v. Omni Hotels Mgmt. Corp.*
   2014 WL 4627271 (C.D. Cal. Sept. 8, 2014) ......................................... 13

*Aichele v. City of Los Angeles*
   314 F.R.D. 478 (C.D. Cal. 2013)............................................................ 25

*Aifang v. Velocity VII Ltd. P'ship*
   2015 WL 12745806 (C.D. Cal. Sept. 30, 2015) ....................................... 7

*Allen v. Hyland's Inc.*
   300 F.R.D. 643 (C.D. Cal. 2014)..................................................... 17, 18

*Am. Master Lease LLC v. Idanta Partners, Ltd.*
   225 Cal. App. 4th 1451 (2014) .............................................................. 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
   568 U.S. 455 (2013) ............................................................................... 12

*Asian Am. Ent. Corp. v. Las Vegas Sands, Inc.*
   324 F. App'x 567 (9th Cir. 2009).......................................................... 17

*Benson v. JPMorgan Chase Bank, N.A.*
   2010 WL 1526394 (N.D. Cal. Apr. 15, 2010)................................... 9, 23

*Bentley v. United of Omaha Life Ins. Co.*
   2018 WL 3357458 (C.D. Cal. May 1, 2018)......................................... 25

*Billitteri v. Sec. Am., Inc.*
   2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ....................................... 15

*Bowoto v. Chevron Corp.*
   2006 WL 2455761 (N.D. Cal. Aug. 22, 2006) ...................................... 19

*Brickman v. Fitbit, Inc.*
   2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) ...................................... 24

*Brown v. DirecTV, LLC*
   330 F.R.D. 260 (C.D. Cal. 2019)........................................................... 13

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

*Bruhl v. Price Waterhousecoopers Int'l*
    257 F.R.D. 684 (S.D. Fla. 2008) ................................................................ 21

*Cabot E. Broward 2 LLC v. Cabot*
    2018 WL 2006762 (S.D. Fla. Mar. 21, 2018) ............................................. 14

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*
    885 F.3d 560 (9th Cir. 2018) ........................................................................ 8

*Casey v. U.S. Bank, N.A.*
    127 Cal. App. 4th 1138 (2005) ............................................................ 14, 22

*Chang v. Wells Fargo Bank, N.A.*
    2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) ............................................. 21

*Clothesrigger, Inc. v. GTE Corp.*
    191 Cal. App. 3d 605 (1987) ...................................................................... 19

*Cole v. Asurion Corp.*
    267 F.R.D. 322 (C.D. Cal. 2010) ............................................................... 24

*Commodity Futures Trading Comm'n v. Oasis Int'l Grp., Ltd.*
    2020 WL 8617638 (M.D. Fla. Jan. 28, 2020) .............................................. 8

*Dickey v. Advanced Micro Devices, Inc.*
    2019 WL 251488 (N.D. Cal. Jan. 17, 2019) ............................................... 24

*Doe v. Neopets, Inc.*
    2016 WL 7647684 (C.D. Cal. Feb. 22, 2016) ............................................ 16

*Dow Chem. Co. v. Mahlum*
    970 P.2d 98 (Nev. 1998) ............................................................................. 19

*Evans v. ZB, N.A.*
    779 F. App'x 443 (9th Cir. 2019) ......................................................... 21, 22

*Falco v. Nissan N. Am. Inc.*
    2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) .............................................. 25

*Flack v. Nutribullet, L.L.C.*
    2019 WL 1596652 (C.D. Cal. Apr. 12, 2019) ............................................ 18

*Future Grp., II v. Nationsbank*
    478 S.E.2d 45 (S.C. 1996) .......................................................................... 19

iii

*Gonzales v. Lloyds TSB Bank*
 2007 WL 9711433 (C.D. Cal. May 2, 2007) .................................................. 14, 20, 24

*Hanlon v. Chrysler Corp.*
 150 F.3d 1011 (9th Cir. 1998) ................................................................ 15

*Hanon v. Dataproducts Corp.*
 976 F.2d 497 (9th Cir. 2015) ................................................................. 15

*HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.*
 107 A.3d 114 (Pa. Super. 2014) ............................................................. 19

*Hurtado v. Super. Ct.*
 11 Cal. 3d 574 (1974) .......................................................................... 19

*In re Checking Acct. Overdraft Litig.*
 275 F.R.D. 666 (S.D. Fla. 2011) ............................................................ 19

*In re ConAgra Foods, Inc.*
 90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................................... 15

*In re First Alliance Mortg. Co.*
 471 F.3d 977 (9th Cir. 2006) ........................................................... 14, 23, 24

*In re Korean Ramen Antitrust Litig.*
 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ................................................. 20

*In re Lendingclub Sec. Litig.*
 282 F. Supp. 3d 1171 (N.D. Cal. 2017) ..................................................... 15

*In re Optical Disk Drive Antitrust Litig.*
 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .................................................. 20

*In re Shapiro*
 128 B.R. 328 (Bankr. E.D.N.Y. 1991) ....................................................... 5

*Jenson v. Fiserv Tr. Co.*
 256 F. App'x 924 (9th Cir. 2007) ........................................................... 23

*Jimenez v. Allstate Ins. Co.*
 765 F.3d 1161 (9th Cir. 2014) ................................................................ 13

*Johnson v. Columbia Props. Anchorage, LP*
 437 F.3d 894 (9th Cir. 2006) ................................................................. 19

iv

*Joint Equity Comm. of Invs. of Real Est. Partners, Inc. v. Coldwell Banker*
   *Real Est. Corp.*
   281 F.R.D. 422 (C.D. Cal. 2012) ................................................. 15, 23, 25

*Jordan v. Paul Fin., LLC*
   285 F.R.D. 435 (N.D. Cal. 2012) ........................................................ 22

*Just Film, Inc. v. Buono*
   847 F.3d 1108 (9th Cir. 2017) ............................................................ 24

*Kearney v. Salomon Smith Barney, Inc.*
   39 Cal. 4th 95 (2006) ........................................................................ 18

*Klein v. Chevron U.S.A., Inc.*
   202 Cal. App. 4th 1342 (2012) .......................................................... 24

*Leyva v. Medline Indus. Inc.*
   716 F.3d 510 (9th Cir. 2013) .............................................................. 24

*Liquidation Tr. v. Grobstein, Horwath & Co., LLP*
   2011 WL 13217688 (C.D. Cal. May 2, 2011) ................................... 19

*Lorenz v. E. W. Bancorp, Inc.*
   2016 WL 199392 (C.D. Cal. Jan. 14, 2016) ...................................... 21

*Martin v. Monsanto Co.*
   2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ................................... 25

*Menagerie Prods. v. Citysearch*
   2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) .................................... 18

*Morgan v. U.S. Soccer Fed'n, Inc.*
   2019 WL 7166978 (C.D. Cal. Nov. 8, 2019) .................................... 14

*Nguyen v. Radient Pharm. Corp.*
   287 F.R.D. 563 (C.D. Cal. 2012) ...................................................... 13

*Novoa v. GEO Grp., Inc.*
   2019 WL 7195331 (C.D. Cal. Nov. 26, 2019) .................................. 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*
   2021 WL 1257845 (9th Cir. Apr. 6, 2021) ........................................ 12

*Phillips Petroleum Co. v. Shutts*
   472 U.S. 797 (1985) .......................................................................... 17

v

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City
Community Dev't Corp.*
387 S.W.3d 525 (Tenn. Ct. App. 2012) ....................................................................... 19

*Rilley v. MoneyMutual, LLC*
329 F.R.D. 211 (D. Minn. 2019) ................................................................................. 20

*Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.*
103 Cal. App. 3d 198 (1980) ....................................................................................... 18

*Rodriguez v. Hayes*
591 F.3d 1105 (9th Cir. 2010) ..................................................................................... 15

*Roos v. Morrison*
913 So. 2d 59 (Fla. Dist. Ct. App. 2005) .................................................................... 19

*Sevilla v. Aaron's, Inc.*
2019 WL 2879874 (C.D. Cal. Mar. 25, 2019) ............................................................ 16

*Staton v. Boeing Co.*
327 F.3d 938 (9th Cir. 2003) ....................................................................................... 15

*Stetser v. TAP Pharm. Prod., Inc.*
598 S.E.2d 570 (N.C. 2004) ........................................................................................ 19

*Takiguchi v. MRI Int'l, Inc.*
2016 WL 1091090 (D. Nev. Mar. 21, 2016) .......................................................... 14, 20

*Torres v. Mercer Canyons Inc.*
835 F.3d 1125 (9th Cir. 2016) ..................................................................................... 16

*True Health Chiropractic, Inc. v. McKesson Corp.*
896 F.3d 923 (9th Cir. 2018) ....................................................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*
136 S. Ct. 1036 (2016) ................................................................................................. 16

*Venture Gen. Agency, LLC v. Wells Fargo Bank*, N.A.
2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ................................................................ 5

*Wash. Mut. Bank v. Super. Ct.*
24 Cal.4th 906 (2001) .................................................................................................. 17

*ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*
917 So. 2d 368 (Fla. Dist. Ct. App. 2005) .................................................................. 19

vi

**Other Authorities**

ALI, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010) ............................. 19

Charles Elmore, *State Names Receiver for Dunewood Funding*, Palm Beach Post
    (May 11, 1993), 1993 WLNR 1380012 .......................................................... 5

Jay Weaver, *Judge gives 12-year max to Ponzi schemer who stole millions*, Miami
    Herald (Oct. 15, 2019) ............................................................................... 11

Symeon Symeonides, *The Third Conflicts Restatement's First Draft on Tort Conflicts*
    92 Tulane L. Rev. 1 (2017) ........................................................................ 18

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

FINRA Rule 2090 ........................................................................................ 5

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that at 10:00 a.m. on June 25, 2021, at 350 West 1st Street, Los Angeles, CA, 90012, Courtroom 8C, before the Honorable Dolly M. Gee, Plaintiffs Mark Baker, Jay Beynon Family Trust DTD 10/23/1998, Alan and Marlene Gordon, Joseph C. Hull, Lloyd and Nancy Landman, and Lilly A. Shirley, will and do hereby move the Court, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), for an order certifying a class of all persons who from July 1, 2012 through December 1, 2017 invested in Woodbridge FPCM promissory notes or Woodbridge units. Excluded from the class are Comerica, its parents, subsidiaries, affiliates, officers and directors, and any entity in which Comerica has a controlling interest or which has a controlling interest in Comerica. Also excluded from the class are investors who recovered the principal they invested in Woodbridge, and the judicial officers to whom this matter is assigned and their staff and immediate family members.

Plaintiffs will also move the Court to appoint them as class representatives and to appoint the law firm of Girard Sharp LLP as lead class counsel and a Plaintiffs' executive committee consisting of the law firms Berger & Montague, P.C.; Cohen Milstein Sellers & Toll PLLC; Kozyak Tropin & Throckmorton; Levine Kellogg Lehman Schneider & Grossman LLP; Sonn Law Group P.A.; and Wolf Haldenstein Adler Freeman & Herz LLP. This motion is based upon this Notice of Motion and Motion; the incorporated Memorandum of Law that follows; the Declarations of Mark Baker ("Baker Decl."), Jay Beynon ("Beynon Decl."), Alan and Marlene Gordon ("Gordon Decl."), Joseph C. Hull ("Hull Decl."), Lloyd and Nancy Landman ("Landman Decl."), Lilly A. Shirley ("Shirley Decl."), Michael I. Goldberg ("Goldberg Decl."), and Daniel C. Girard ("Girard Decl."); Plaintiffs' Trial Plan; the evidence submitted in support of the motion; any additional evidence submitted on reply; and any argument presented to the Court.

The motion follows the conference of counsel for Plaintiffs and Defendant pursuant to Local Rule 7-3 on March 25, 2021.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

## I.   INTRODUCTION

Plaintiffs' aiding and abetting claims against Comerica Bank satisfy Rule 23's requirements for certification. Comerica served as the exclusive banker for the Woodbridge Group of Companies, which raised $1.2 billion in real estate investments while running a Ponzi scheme. Woodbridge principal Robert H. Shapiro used new investor funds to pay returns to earlier investors and to cover sales commissions and overhead, and diverted the balance to his personal benefit. The money that Plaintiffs and class members invested in Woodbridge was uniformly deposited in Woodbridge's Comerica accounts, and investors received returns out of these same Comerica accounts until Woodbridge went bankrupt. Joinder of the many hundreds of investors is impracticable, and the claims center on common questions such as whether Comerica knew of and substantially assisted the fraud and breaches of fiduciary duty. Plaintiffs assert claims that are typical of those of other Class members. They will fairly and adequately represent the interests of the Class, and have retained experienced counsel to prosecute the claims. Plaintiffs meet the requirements of Rule 23(a).

Plaintiffs' claims will stand or fall based on common proof of Comerica's aiding and abetting the Woodbridge scheme. Common issues predominate as to these investor claims—which are governed by California law because Woodbridge was based in the San Fernando Valley and did its banking at Comerica's Studio City branch, Comerica employees visited Woodbridge at its office in Sherman Oaks, and Woodbridge investors were instructed to send wires to Comerica Bank at a California address and were paid returns on checks drawn from "Comerica Bank-California." On the key elements of knowledge and participation, the evidence shows that Comerica's artificial intelligence systems notified bank personnel hundreds of times of red-flagged, suspicious account activity. Comerica processed over 10,000 internal transfers totaling $1.6 billion among related Woodbridge accounts and hundreds of millions of dollars in transfers to vaguely denominated attorney trust accounts. Comerica went to great lengths to retain Shapiro's business even after Comerica received ███████ subpoenas from January 2015 to

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

January 2018 from different federal and state regulators for its records associated with the Woodbridge accounts, and even after learning that Woodbridge had been ordered by the state regulators of several states to cease and desist its fraudulent investment business. Though Woodbridge's banking activity made no sense on any level, Comerica had identified Shapiro as a "High End Client" and believed it was free to provide its services to Woodbridge until confronted with "enough evidence to confirm that our customer is involved in a criminal enterprise."

No investor would have invested had they been told the true nature of the Woodbridge investment, and no challenge Comerica might raise to class certification will affect the common evidence that will drive the outcome of the litigation. Slightly over half of the investors assigned their claims against Comerica to the Liquidation Trustee in the Woodbridge bankruptcy proceeding, Michael I. Goldberg, who provides a declaration in support of class certification. The investor claims he has been entrusted with prosecuting against Comerica arise from the same course of conduct as all the other class claims, raise no individual issues or conflicts among Class members, and can be efficiently tried in the same proceeding. Accordingly, the Court should certify the investor class.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs Invested in the Woodbridge Ponzi Scheme.

From around July 2012 through December 4, 2017, Robert Shapiro ran a nationwide investment scheme, raising money from over 8,400 investors nationwide. Goldberg Decl., ¶ 8 & Ex. B (Declaration of Soneet R. Kapila ("Kapila Decl."), ¶ 85). Woodbridge raised money by selling promissory notes and subscription arrangements under which investors purchased units in Woodbridge funds. Goldberg Decl., Ex. B (Kapila Decl., ¶¶ 22-59). Woodbridge promised to lend the money raised from investors for a short term, and for only about two-thirds of the value of the real estate securing the transaction, such that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." Girard Decl., Exs. 1, 2 (WGC IM_0368701;

2

WBPLAINTIFF_GORDON_ 000001 at -10). Shapiro never lent the money to independent borrowers, however. He lent the money to LLCs he controlled and Woodbridge took in virtually no interest income from borrowers. Goldberg Decl., Ex. B (Kapila Decl., ¶¶ 92-94).

Although Woodbridge raised at least $1.22 billion from Plaintiffs and other investors, it issued only around $675 million in nominal "loans" for real estate purportedly securing the investments. Goldberg Decl., Ex. B (Kapila Decl., ¶¶ 85, 91-94). Almost all the proceeds went to purchase properties in the name of Shapiro's nominees. *Id*. ¶¶ 92-94. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers—far less than needed to cover Woodbridge's overhead and pay returns to investors. *Id*. ¶¶ 19, 86. Despite the shortfall, Woodbridge paid investors over $368 million and spent another $172 million on operating expenses. *Id*. ¶¶ 108-10 & Exs. F, F1. Shapiro and his wife diverted another $21.2 million to lavish personal expenditures. *Id*. ¶¶ 104-06.

Each of the Class Representatives purchased notes or units in a Woodbridge fund believing Woodbridge was a legitimate investment enterprise.[1] Baker Decl., ¶ 2, Beynon Decl., ¶ 2, Gordon Decl., ¶ 2, Hull Decl., ¶ 2, Landman Decl., ¶ 2; Shirley Decl., ¶ 2. Investors have received some of their money back from interim distributions in the Woodbridge bankruptcy, but the remaining assets will not make up the shortfall, and the investors—mostly seniors, as represented by six of the class representatives—face substantial losses on their investments. *E.g.*, Shirley Decl., ¶¶ 2, 3 (Plaintiff, a retired South Carolina special education teacher, is 71); Gordon Decl., ¶¶ 2, 3.

**B.    Comerica Knew of and Acted in Furtherance of the Woodbridge Fraud.**

To sustain the Woodbridge scheme, Shapiro needed a continuous infusion of new investments and a compliant financial institution to handle the money, no questions asked. Shapiro ran the Woodbridge scheme in plain view of Comerica. Despite the

---

[1] Plaintiffs Albert and Freda Lynch elected to dismiss their claims without prejudice due to Mr. Lynch's worsening health. Robert Prince dismissed his claims without prejudice due to personal commitments precluding him from serving as a named plaintiff.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

1    alerts triggered by Woodbridge's frenzied related-party transfers—a known marker of

2    fraud—Comerica executives, motivated to retain Shapiro as a highly profitable

3    customer, continued catering to Shapiro even after the Woodbridge scheme began to

4    unravel. Even though Comerica compliance personnel were notified again and again by

5    its internal monitoring systems of suspicious banking activity, ███████████████

6    █████████████████████████████████████████████████████████████

7    ███████████████████████. Girard Decl., Ex. F (Deposition of ██████████

8    ("██████ Dep.") at 128-29); Ex. 3 (COM0236196 at -205) (Comerica recognizing

9    ████████████████████████████); Ex. 4 (COM0233012 at -23).

10        Comerica's employees worked closely with Shapiro for years, knew his history of

11   financial wrongdoing, actively monitored his transactions, saw the pattern of circular

12   transfers between accounts, were informed by state authorities of his ongoing illegal

13   conduct, and flagged suspect activity in the Woodbridge accounts more than a hundred

14   times with its internal fraud monitoring systems—in 2016 and 2017 alone. Comerica

15   simply chose to align itself with Woodbridge at the investors' expense.

16        ***Comerica's close relationship with Shapiro and Woodbridge.*** Comerica was

17   highly motivated to keep Shapiro's business because he was a highly profitable

18   customer—approximately $1.66 billion flowed through Comerica accounts over the

19   course of nearly 11,000 transactions. Goldberg Decl., ¶ 8 & Ex. B (Kapila Decl., ¶ 89).

20   Comerica profited from fees and from investing the funds on deposit; Comerica

21   employees emphasized that Shapiro was a "High End Client with a large relationship"

22   with the bank. Girard Decl., Ex. 6 (COM0228118 at -19).

23        Employees at Comerica's Studio City branch, where Shapiro opened 23 accounts,

24   afforded him special treatment. *E.g.*, Girard Decl., Ex. 6 (COM0229119). Comerica

25   personnel knew the nature of Woodbridge's business and regularly visited its offices in

26   Sherman Oaks, in the San Fernando Valley. █████████████████████████

27   ████████████████████████████████████████████████████████

28   █████████████████████████████████████████████████. *Id.*;

4

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

*see also id.*, Exs. 8, G (WGC IM_0720311; Deposition of ████████ ("████

Dep.") at 80-83:7). In addition, Comerica's corporate officers gave Shapiro special

treatment. *E.g.*, *id.*, Ex. 9 (COM0236450 at -65).

Comerica was also familiar with Shapiro's history of fraudulent conduct. In 2011

Comerica obtained a report on Shapiro (Girard Decl., Ex. 10 (COM0236076 at -85))

revealing his involvement in an earlier scheme, "Dunewood," a real-estate investment

scam similar to Woodbridge, launched in 1990. Shapiro stole the investors' money.

*See* Charles Elmore, *State Names Receiver for Dunewood Funding*, Palm Beach Post

(May 11, 1993), 1993 WLNR 1380012. Shapiro filed for bankruptcy and admitted to

diverting money for personal use and transferring money overseas to hide it from

creditors. *In re Shapiro,* 128 B.R. 328, 332 (Bankr. E.D.N.Y. 1991) ("Robert Shapiro,

having filed no answer, admitted the well pleaded allegations of the petition"). The

investors sued, judgments were entered against Shapiro, and, between 1995 and 2004,

federal and state tax authorities placed at least a dozen liens on Shapiro properties. *See*

*id.*; Girard Decl., Ex. 10 (COM0236076 at -85-87). The 2011 report Comerica reviewed

had records of judgments and liens imposed by the IRS and by California, Florida, and

New York authorities from 1992 to 2010. *Id*. at -85-87. Comerica ████████████

████████, even as Shapiro was operating the sequel to Dunewood before its eyes.

**_Banking activity inconsistent with Woodbridge's stated business model._** Both

federal law (the Bank Secrecy Act) and the Financial Industry Regulatory Authority

(FINRA) require banks to know their customers and understand their customers'

banking behavior.[2] Comerica knew Woodbridge was intaking investments in "hard-

money" real estate loans, and had previously trafficked in structured settlements,

annuities, and lottery winnings. Girard Decl., Ex. G (██████ Dep. at 51-52).

---

[2] *See Venture Gen. Agency, LLC v. Wells Fargo Bank*, *N.A.*, 2019 WL 3503109, at *6
(N.D. Cal. Aug. 1, 2019) (discussing BSA obligations); Compl., ¶¶ 33-43; FINRA Rule
2090, *Know Your Customer* ("Every member shall use reasonable diligence, in regard to
the opening and maintenance of every account, to know (and retain) the essential facts
concerning every customer and concerning the authority of each person acting on behalf
of such customer."), https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

█████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

████ . *Id.*, Ex. H (Deposition of ████████ ("███ Dep.") at 113-115, 121-126).

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████ .

*Id.*, Ex. 7 (COM0229119); Ex. F (████ Dep. at 128-129). Rather than raising money

from investors, using that money to make real estate loans to borrowers, and earning

money on the difference, Comerica saw Woodbridge raise $1.22 billion from retail

investors and ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ . *Id.*, Ex. H (████ Dep. at 126-128, 147-153); Goldberg Decl.,

¶ 8 & Ex. B (Kapila Decl., ¶¶ 104-106).

　　　　Comerica's compliance staff and the Studio City branch management were

repeatedly confronted with suspicious transfers inconsistent with Woodbridge's

fiduciary role, including extensive commingling of funds. Girard Decl., Ex. G (████

Dep. at 149-151). Comerica's Studio City personnel often communicated with Shapiro

about the need to cover payments to investors. Girard Decl., Ex. 8 (WGC IM_0720311)

(Shapiro asking two branch managers whether he needed to "move any funds around"

to make sure no checks were returned due to holds). Yet, instead of loaning them out to



PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

borrowers, Woodbridge swept these funds into operating accounts. Goldberg Decl., ¶ 8 & Ex. B. (Kapila Decl., ¶¶ 9, 89). Then from the operating accounts, Woodbridge paid employees and sales agents—and it made large, unexplained transfers to attorney trust accounts. Girard Decl., Ex. 4 (COM0233012 at   -024-25); Goldberg Decl., Ex. B (Kapila Decl., ¶ 78). Woodbridge's unusual account activity using commingled funds occurred at a high volume on a monthly basis, throughout all investment accounts, throughout the class period, a pattern incompatible with any legitimate business model. *Id.* ¶ 89.

***Disbursements and personal expenditures from investor funds.*** Comerica personnel regularly processed transfers from Woodbridge's Comerica accounts for Shapiro's own benefit, including over $2 million on expensive sports cars, wine, jewelry and home furnishings, $1.4 million for retail purchases at high-end stores like Chanel and Louis Vuitton, and satisfying his wife's credit card balance. Goldberg Decl., Ex. B. (Kapila Decl., ¶¶ 104-06 & Ex. H thereto). Shapiro diverted investor funds to pay off approximately $9 million in credit-card debt, and his wife and her company also received diverted investor proceeds out of Woodbridge's Comerica accounts. *Id.* Shapiro was ultimately ordered to pay more than $20 million in disgorgement.

***Large and manifold transactions with attorney trust accounts.*** Ponzi schemes commonly rely on attorney trust accounts to evade scrutiny while commingling and misappropriating investor funds.[3] Woodbridge was no different. Goldberg Decl., Ex. B (Kapila Decl., ¶ 78). Comerica processed numerous unusual transactions involving attorney trust accounts without seriously questioning the activity. *Id.* For example, in 2017, Comerica analysts ███████████████████████████████. Girard Decl., Ex. 4 (COM0233012 at -23-25). In a February 28, 2017 review of the Woodbridge operating account ████████████████████ triggered Comerica's fraud monitoring systems, the analyst noted that ████████████████

---

[3] *Aifang v. Velocity VII Ltd. P'ship*, 2015 WL 12745806, at *5 (C.D. Cal. Sept. 30, 2015) (bank's awareness that investor money was being put into an attorney trust account supported claim of aiding and abetting in case arising out of a Ponzi scheme).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Six

2  months later, a Comerica analyst noted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 11 (COM0234042 at -53-54).

4      ***Pass-through accounts.*** Another Ponzi hallmark is a "pass-through" operating

5  account, which begins and ends the month with a similar balance but sees millions or tens

6  of millions of dollars in banking activity during the month.[4] Despite internal monitoring

7  systems repeatedly warning Comerica of Woodbridge's circular transfers between

8  accounts, Comerica ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮. *E.g.*, Girard Decl., Ex. 12 (COM0236178). In July 2014, for

10  example, a Woodbridge operating account began the month with a balance of around

11  $517,000. Even though nearly $23 *million* in credits came in, the month-end balance was

12  only $555,126. In February 2016, the account began the month with less than $600,000,

13  had nearly $48 million pass through it, and ended with under $800,000. Girard Decl., ¶

14  10. Comerica maintains ▮▮▮▮▮▮▮▮▮▮▮▮ (Girard Decl., Ex. H (▮▮ Dep. at

15  122-23)) despite the fact that Shapiro was *the only signatory* on the accounts and he was

16  *personally signing* checks. Girard Decl., Ex. 12 (COM0236178 at -87).

17      ***Large, round dollar transactions.*** Transfers in large, round dollar amounts are

18  another recognized marker of potentially fraudulent activity.[5] ▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Girard Decl., Ex. H (▮▮

22  Decl. at 113-15). A high percentage of the $1.3 billion in transfers from investment fund

23  accounts to operating accounts were made in round numbers ending in "000.00" and

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  [4] *Commodity Futures Trading Comm'n v. Oasis Int'l Grp., Ltd.*, 2020 WL 8617638, at *1 (M.D. Fla. Jan. 28, 2020) (in the Ponzi scheme, bank accounts "acted as pass-through accounts from which investor funds were then transferred . . . .").

27  [5] *California Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 581 (9th Cir. 2018)

28  (evidence of "several red flags, including 'large dollar' and 'round dollar' amounts" supported FDIC's determination that a suspicious activity report should have been filed).



1  averaging more than $550,000. Girard Decl., ¶ 9.

2  **Shapiro and Woodbridge were unlicensed and had been sanctioned.** Comerica

3  knew that, while Woodbridge's core business was selling investment securities, the

4  SEC had never licensed Shapiro and Woodbridge to sell securities and state authorities

5  had sanctioned them for securities fraud and were continuing to investigate. Non-

6  licensure is an indication of a Ponzi scheme, suggesting efforts to evade regulatory

7  scrutiny.[6]

8  **Alerts and reviews.** Comerica used a range of sophisticated investigative and

9  monitoring tools to detect fraudulent activity. Girard Decl. Ex. F (████ Dep. at 49-

10  50). Comerica's systems operated as intended—and alerted bank personnel to

11  fraudulent activity in Woodbridge accounts hundreds of times. *E.g.*, Girard Decl., Exs.

12  4, 5, 11, 13, 18 (COM0233012; COM0233822; COM0234042; COM0233050;

13  COM0233166). Comerica ██████████████████████ activity

14  characteristic of a Ponzi scheme, such as ████████████████

15  ██████████████████████████████████████

16  ████████████████████████████████

17  ███████████. *E.g.*, *id*., Ex. 4 (COM0233012 at -024-25). Even

18  as they acknowledged seeing classic Ponzi indicators, Comerica analysts brushed off

19  what they saw, or their efforts to escalate were overruled by Comerica executives. *E.g.*,

20  *id*., Ex. 13 (COM0233050 at -61).

21  **Legal Proceedings.** Beginning in 2015 Comerica was served with ████████

22  subpoenas from state and federal regulators and law enforcement officials in connection

23  with the Woodbridge accounts. Comerica received subpoenas from the SEC, the

24  ████████████, the IRS, California, Massachusetts, Florida and Wisconsin.

25  Girard Decl., Ex. E (Comerica RFA Resps. at 20-24). The focus of these subpoenas was

26  apparent. Numerous Florida subpoenas were issued by the state's "Economic Crimes"

27

28

---

[6] *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *3 (N.D. Cal. Apr. 15, 2010) (Chase's knowledge that neither its client nor "his associates, nor [his entities] were registered to sell securities" suggested Chase knew its client was running a Ponzi scheme).

unit. *Id.*, Ex. 15 (COM0474606). Further, regulators in Texas, Massachusetts, Arizona, Pennsylvania, and Michigan issued cease-and-desist or consent orders concerning Woodbridge's securities fraud and sales of unregistered securities. Goldberg Decl., Ex. B (Kapila Decl., ¶ 103); Girard Decl., Ex. 15 (COM0236558); Ex. 16 (COM0233768). According to Comerica's documents, the Texas cease-and-desist order was ███████ ███████████." Ex. 19 (COM0236424). But, even after the Texas State Securities Board, in 2015, emailed a news release announcing it had sanctioned Woodbridge for securities violations *directly to* a Comerica assistant vice president for compliance, and even after reviewing a cease-and-desist order that found "Respondents Woodbridge and Shapiro are engaging in fraud in connection with the offer and sale of securities," Comerica continued servicing the Woodbridge accounts. *E.g.*, Girard Decl., Exs. 17, 18, 15, 19 (COM0229789; COM0233166; COM0236558; COM0236424 at -36-37).

Comerica subsequently learned in November 2016 that the SEC was investigating Woodbridge. Girard Decl., Ex. E (Comerica RFA Resps. at 20-24). In ██████████, Comerica █████████████████████████████████████████████████ ██████████████████████. *Id.* In September 2017, a compliance executive at the bank began receiving multiple SEC email bulletins announcing that the SEC had obtained a court order compelling Woodbridge to comply with a subpoena, and that a second proceeding was underway because Woodbridge was refusing to comply and turn over the information. *Id.*, Exs. 23, 24 (COM0231150; COM0231160). Days later, two Comerica executives exchanged emails about negative news articles about Woodbridge but concluded that Comerica *could keep servicing* its Woodbridge accounts—the articles were "not enough evidence to confirm that our customer is involved in a criminal enterprise." *Id.*, Ex. 25 (COM0231037).

## III.   PROCEDURAL BACKGROUND

The Woodbridge entities declared bankruptcy on December 4, 2017. *See In re Woodbridge Grp. of Cos.*, No. 17-12560-BLS (Bankr. D. Del.) ("Bankruptcy"). On December 20, 2017, the SEC filed a civil complaint in the Southern District of Florida

10

charging that Shapiro ran a "massive Ponzi scheme" and had misappropriated millions of dollars. *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla. filed Dec. 20, 2017). On December 27, 2018, the district court entered final judgments against the Woodbridge entities and Shapiro. Bankruptcy [Doc. # 159, 160 (ordering Woodbridge to pay $892 million in disgorgement, Shapiro to pay $120 million)]. On August 5, 2019, Shapiro pleaded guilty to mail and wire fraud and tax evasion. *See United States v. Shapiro*, No. 1:19-cr-20178-CMA [Doc. # 139] (S.D. Fla. filed Aug. 7, 2019). In October 2019, U.S. District Judge Cecilia Altonaga sentenced Shapiro to the maximum sentence of 25 years, explaining in part that his crimes "destroyed thousands of lives of elderly folks and retired military who were specifically targeted" and "we need to punish [him] severely because the harm was so severe."[7]

Plaintiff Jay Beynon brought the first of a series of lawsuits against Comerica in this district on January 4, 2018, for aiding and abetting the Woodbridge scheme. *See* Class Action Compl., *In re Woodbridge Invs. Litig.*, No. 18-cv-00103-DMG-MRW (C.D. Cal. Jan. 4, 2018) [Doc. # 1]. Comerica sued the class representatives in the Bankruptcy Court, seeking an injunction barring them from prosecuting their claims in this Court. *See* Compl., No. 18-50382-BLS (Bankr. D. Del. Apr. 4, 2018) ("Adversary Proceeding") [Doc. # 1]. The parties negotiated an agreement to stay the injunction proceeding (and in turn the class action) pending confirmation of the Bankruptcy plan, and this Court approved the stay. [Docs. # 51, 52].

On October 26, 2018, the Bankruptcy Court confirmed the bankruptcy plan. Bankruptcy [Doc. # 2903]. The Woodbridge Liquidation Trust was formed to pursue the liquidation trust assets and distribute the proceeds to the Trust beneficiaries. As part of the plan, former Woodbridge investors were offered the option of assigning their claims against third parties, including Comerica, to a Liquidation Trust ("Contributed Claims").

---

[7] *See id.* [Doc. # 175]; Jay Weaver, *Judge gives 12-year max to Ponzi schemer who stole millions from Florida to California*, Miami Herald (Oct. 15, 2019), https://www.miamiherald.com/news/local/article236215238.html#:~:text=After%20sever al%20victims%20of%20his,investment%20fraud%20and%20tax%20evasion.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

Michael I. Goldberg, the Liquidation Trustee, is authorized to pursue avoidance claims and causes of action held by the Bankruptcy debtors (including certain Woodbridge entities) as well as the Contributed Claims assigned by Woodbridge investors. On August 15, 2019, the Bankruptcy Court granted Plaintiffs' motion that it abstain from hearing the Adversary Proceeding, so that the class action could proceed. Adversary Proceeding [Doc. # 36].

On August 22, 2019, this Court lifted the stay of proceedings. [Doc. # 81]. On August 5, 2020, the Court denied Comerica's motion to dismiss the aiding and abetting claims. [Doc. # 144]. The Court noted Plaintiffs' allegations of Comerica's "close business relationship with Shapiro, its awareness of banking activity inconsistent with Woodbridge's stated business model, and Shapiro's disbursements and personal expenditures from investor funds" and that "a bank's decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge" under California law. *Id.* at 8-9.

## IV.   LEGAL STANDARD

Plaintiffs must prove by the preponderance of evidence that the Rule 23(a) requirements and at least one of the Rule 23(b) requirements are satisfied. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, — F.3d —, 2021 WL 1257845, at *4 (9th Cir. Apr. 6, 2021). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## V.   ARGUMENT

Plaintiffs' evidence satisfies all requirements for class certification under Rule 23(a) and 23(b)(3). Plaintiffs and all class members invested in Woodbridge securities believing that Woodbridge operated as a legitimate real-estate investment company, and none was aware that Shapiro was perpetrating a Ponzi scheme. Plaintiffs' aiding and abetting claims arise from Comerica's common course of conduct and not the individual experiences of class members. Consistent with their Trial Plan, submitted herewith, Plaintiffs move to certify the following class with respect to their claims against

Comerica for (1) aiding and abetting fraud and (2) aiding and abetting breach of fiduciary duty:

> All persons in the United States who from July 1, 2012 through December 1, 2017 invested in Woodbridge FPCM promissory notes or Woodbridge units.
>
> Excluded from the class are Comerica, its parents, subsidiaries, affiliates, officers and directors, and any entity in which Comerica has a controlling interest or which has a controlling interest in Comerica. Also excluded from the class are investors who recovered the principal they invested in Woodbridge, and the judicial officers to whom this matter is assigned and their staff and immediate family members.

This definition properly "describes a set of common characteristics sufficient to allow [a class member] to identify himself or herself as having a right to recover based on the description." *Ades v. Omni Hotels Mgmt. Corp.*, 2014 WL 4627271, at *7 (C.D. Cal. Sept. 8, 2014) (citation omitted). The class is adequately "defined using objective criteria[.]" *Brown v. DirecTV, LLC*, 330 F.R.D. 260, 268 (C.D. Cal. 2019). In addition, the Liquidation Trust acquired Woodbridge's records and has verified the identity and contact information of all Woodbridge investors, so there will be no difficulty identifying Class members or giving them notice. Goldberg Decl., ¶¶ 30, 31.

### A.    The Prerequisites of Rule 23(a) Are Met.

#### 1.    The Class is Sufficiently Numerous to Make Joinder Impracticable.

Numerosity under Rule 23(a)(1) is met in this case because the class consists of thousands of investors. Goldberg Decl., ¶ 27; *see Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 569 (C.D. Cal. 2012) (a class of at least 40 is presumptively numerous).

#### 2.    Plaintiffs' Claims Involve Common Issues of Fact and Law.

Plaintiffs satisfy the commonality requirement because class members' claims "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central the validity of each claim in one stroke." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quotation marks and citation

13

omitted); *see Morgan v. U.S. Soccer Fed'n, Inc.*, 2019 WL 7166978, at *7 (C.D. Cal. Nov. 8, 2019). Comerica's liability for aiding and abetting turns on (1) whether it knew that Shapiro was engaging in fraud or breaching a fiduciary duty; and (2) whether it provided substantial assistance to Shapiro in carrying out this unlawful conduct. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 994 (9th Cir. 2006) (citing *Casey v. U.S. Bank, N.A.*, 127 Cal. App. 4th 1138 (2005)). The answers to these questions—up or down—will be the same for all class members.

Common evidence shows, among other things, Comerica's close relationship with Shapiro, ███████████████████████████████████████████████████████████████████ ████████████████████████████████████. Girard Decl., Ex. 6 (COM0228118); Ex. 7 (COM0229119); Ex. 8 (WGC IM_0720311); Ex. G (████ Dep. at 80-81); Ex. H (████ Dep. at 126-28, 147-53). Moreover, Comerica received ████████ subpoenas for its Woodbridge-related records from government officials and knew of the SEC's investigation of and several states' cease-and-desist orders against Woodbridge. *Id*., Ex. E (Comerica RFA Resps. at 20-24). This and other common evidence goes to the heart of Plaintiffs' claims for abetting the fraud, satisfying commonality. *See In re First Alliance*, 471 F.3d at 990 (Ninth Circuit "follow[s] an approach that favors class treatment of fraud claims stemming from a common course of conduct.") (quotation marks and citation omitted); *Gonzales v. Lloyds TSB Bank*, 2007 WL 9711433, at *4 (C.D. Cal. May 2, 2007) (commonality satisfied as to aiding and abetting claims against bank); *Takiguchi v. MRI Int'l, Inc.*, 2016 WL 1091090, at *4 (D. Nev. Mar. 21, 2016) (common issues included whether defendants aided and abetted fraud); *Cabot E. Broward 2 LLC v. Cabot*, 2018 WL 2006762, at *6 (S.D. Fla. Mar. 21, 2018) ("[W]hether Defendants aided and abetted each other in perpetrating the fraud, are all common questions involving common proof, which may be resolved efficiently").

### 3. Plaintiffs' Claims Are Typical of the Class.

Rule 23(a)(3)'s typicality requirement—also satisfied here—is "'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of

absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Typicality is satisfied where the plaintiffs and class members "have the same or similar injury" arising from the "same course of conduct." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 973 (C.D. Cal. 2015) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

In this case, the claims stem from Comerica's common conduct and seek redress for the same injury in the form of lost investments. The investors who assigned their claims to the Liquidation Trust and those who did not have the same interest in holding Comerica accountable for its role in the scheme; the Liquidation Trustee elects to be represented by the Plaintiff investors and their counsel. Thus, because the claims of all class members are substantially identical, Plaintiffs' claims are typical of the class. *See Joint Equity Comm. of Invs. of Real Est. Partners, Inc. v. Coldwell Banker Real Est. Corp.*, 281 F.R.D. 422, 436 (C.D. Cal. 2012) (all investors suffering loss of investment funds hold claims arising from the same conduct based on the same legal theories).

### 4. Plaintiffs and Their Counsel Will Adequately Represent the Class.

Courts ask two questions to evaluate adequacy: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Plaintiffs meet the "modest burden" of Rule 23(a)(4). *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1182 (N.D. Cal. 2017). They have already made significant contributions to the litigation, and appeared for lengthy depositions. Baker Decl., ¶ 5, Beynon Decl., ¶ 5, Hull Decl., ¶ 6, Gordon Decl., ¶ 5, Shirley Decl., ¶ 5, Landman Decl., ¶ 5. Plaintiffs have no conflicts of interest with the other class members and will fairly and adequately protect their rights and interests. *See, e.g.*, *Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *5, *14 (N.D. Tex. Aug. 4, 2011) (approving class settlement as fair, reasonable, and adequate where Liquidating Trustee participated as a class member).

15

1     Proposed class counsel have similarly demonstrated their adequacy. The

2  attorneys working on this case are experienced in prosecuting complex class actions

3  involving investment fraud. Girard Decl., ¶¶ 3-4, 6; *see Doe v. Neopets, Inc.*, No. CV-

4  15-8395-DMG, 2016 WL 7647684, at *4 (C.D. Cal. Feb. 22, 2016) (Gee, J.) ("highly

5  experienced class action attorney" would adequately represent the class). Among other

6  work in this case, class counsel have asserted the class claims and extricated them from

7  the Woodbridge bankruptcy, prepared complaints against and discovery requests to

8  Comerica, briefed the motion to dismiss, and worked diligently to prepare this case for

9  trial. Girard Decl., ¶ 7. Counsel will continue to devote the necessary resources to

10  prosecute this litigation. *Id*. ¶ 9. As such, Plaintiffs respectfully request that the Court

11  appoint Girard Sharp LLP as lead class counsel, to be supported by the experienced

12  executive committee firms.

13        **B.     The Requirements of Rule 23(b)(3) Are Satisfied.**

14             **1.     Common Issues Predominate in Plaintiffs' Claims.**

15        The predominance inquiry turns on whether "common questions present a

16  significant aspect of the case and they can be resolved for all members of the class in a

17  single adjudication." *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923,

18  931 (9th Cir. 2018) (citations omitted). Predominance does not focus on the number of

19  common questions, but whether common "questions [are] apt to drive the resolution of

20  the litigation[.]" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)

21  (citation omitted). Thus "if 'one or more of the central issues in the action are common

22  to the class and can be said to predominate, the action may be considered proper under

23  Rule 23(b)(3) even though other important matters will have to be tried separately, such

24  as damages or some affirmative defenses peculiar to some individual class members.'"

25  *Sevilla v. Aaron's, Inc.*, 2019 WL 2879874, at *5 (C.D. Cal. Mar. 25, 2019) (quoting

26  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)).

27        Common questions of law and fact predominate here. California law governs

28  Plaintiffs' claims because the tortious conduct giving rise to Plaintiffs' injuries occurred

16

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

1
2
3
4

in California and California's interests would be the most impaired if its laws are not
applied. The overarching liability questions are common to the class—whether
Comerica knew of Shapiro's investment fraud and breaches of fiduciary duty, and
provided substantial assistance—and will drive the resolution of the case.

5
6

        **a.**    **California Law Applies to Plaintiffs' Claims Against
Comerica Arising Out of Its Relationship with Woodbridge.**

7
8
9
10
11
12
13
14

Applying California choice-of-law rules in this diversity suit, *see Asian Am. Ent.
Corp. v. Las Vegas Sands, Inc.*, 324 F. App'x 567, 568 (9th Cir. 2009), Plaintiffs have
the initial burden to show California's sufficient contacts to the claims of each class
member. *See Wash. Mut. Bank v. Super. Ct.*, 24 Cal.4th 906, 921 (2001). Plaintiffs meet
that burden, as the evidence reflects that Woodbridge was headquartered in California,
Comerica's banking services were pivotal in facilitating Shapiro's scheme, and Shapiro
conducted his Woodbridge banking activities at Comerica's Studio City, California
branch with the close assistance of senior Comerica branch managers and employees.

15
16
17
18
19
20
21
22
23
24
25
26
27

Woodbridge's main office was at 14225 Ventura Blvd. in Sherman Oaks, CA.
Comerica's Studio City branch maintained and serviced the Woodbridge accounts.
Goldberg Decl., ¶¶ 5, 8. Shapiro had a close relationship with the manager and assistant
manager at the Studio City branch, and branch employees visited Woodbridge's office
in Sherman Oaks. Girard Decl., Ex. G (█████ Dep. at 43). Plaintiffs sent wires to
Comerica Bank with an address listed in California, and they received Woodbridge
"interest" checks drawn on "Comerica Bank-California." *E.g.*, Beynon Decl., Ex. A;
Hull Decl., Exs. D & E. The nexus of Plaintiffs' claims with California is therefore
sufficient: "the application of California law to non-California residents would not
offend the class members' due process rights where the defendant engaged in a
substantial amount of business in California." *Allen v. Hyland's Inc.*, 300 F.R.D. 643
(C.D. Cal. 2014); *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985)
(holding that the court may apply law of forum state to claims of class members in all

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

states).[8]

California's governmental interest test calls for applying California law because the interest of other states does not outweigh California's interest in having its law applied, as wrongdoing largely occurred in California. *See Allen*, 300 F.R.D. at 656. California has a strong interest in deterring tortious conduct within its borders, including conduct that harms both residents and non-residents.[9] Plaintiffs' claims against Comerica principally arise out of its California-based activities, and Comerica's non-resident status does not defeat California's strong interest given that "a company's contacts with a state that are not significantly related to the cause of action at issue are an insufficient basis for the application of that state's law." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 936 (9th Cir. 2000).[10]

No other state has a significant interest in having its laws applied—most of the relevant conduct occurred in California—and applying California law to the aiding and abetting claims of all class members will not contravene the established policy of any other state. *Kearney*, 39 Cal. 4th at 127-28 (California's interest would be more impaired when the defendant "could comply with California law without violating any provision of Georgia law."). No state has adopted a policy promoting the assistance of fraud or breach of fiduciary duty. No state has an "interest in denying full recovery to its residents" for

---

[8] Likewise under the draft Restatement (Third) of Conflict of Laws, "[w]hen the relevant parties have central [personal] links to different states [based on domicile], and conduct and injury occur in different states, the law of the state of conduct will presumptively govern an issue of loss allocation," unless the plaintiff seeks application of the law of the state where injury occurred. Symeon Symeonides, *The Third Conflicts Restatement's First Draft on Tort Conflicts*, 92 Tulane L. Rev. 1, 17, 41 (2017) (second alteration added).

[9] *See Flack v. Nutribullet, L.L.C.*, 2019 WL 1596652, at *4 (C.D. Cal. Apr. 12, 2019) ("California's interest in deterring tortious conduct within its borders is significant."); *Menagerie Prods. v. Citysearch*, 2009 WL 3770668, at *15 (C.D. Cal. Nov. 9, 2009).

[10] *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 126 (2006); *see also Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.*, 103 Cal. App. 3d 198, 206 (1980) (that the defendant was not a California corporation did not mean California lacked an interest in applying its law).

18

aiding and abetting violations, and if California's laws were *not* applied in this case, its interests would be the most impaired. *Hurtado v. Super. Ct.*, 11 Cal. 3d 574, 581 (1974).[11]

Even if the Court decides that California law should not be applied to the claims of all Woodbridge investors, the Court can certify a multistate class where the state laws at issue are "the same in functional content." *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 666, 679 (S.D. Fla. 2011) (citing ALI *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010)). Here, as detailed in Plaintiffs' 44-Jurisdiction Appendix of Aiding and Abetting Law, submitted herewith, California law may apply to the aiding-and-abetting claims of class members—including all Plaintiffs[12] and the Liquidation Trustee[13]—in the 43 states (and D.C.)[14] that follow the standard in section 876 of the Restatement (Second) of Torts for aiding and abetting liability.[15] Because aiding and

---

[11] *See also Bowoto v. Chevron Corp.*, 2006 WL 2455761, at *9 (N.D. Cal. Aug. 22, 2006); *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 615 (1987) ("California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.").

[12] *See, e.g.*, *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014); *Roos v. Morrison*, 913 So. 2d 59, 68 n.1 (Fla. Dist. Ct. App. 2005); *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998); *Stetser v. TAP Pharm. Prod., Inc.*, 598 S.E.2d 570, 583 (N.C. 2004); *HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. 2014); *Future Grp., II v. Nationsbank*, 478 S.E.2d 45, 50 (S.C. 1996); *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Community Dev't Corp.*, 387 S.W.3d 525 (Tenn. Ct. App. 2012).

[13] The Liquidation Trust is considered a citizen of Florida because its trustee is a Florida citizen. Goldberg Decl., ¶ 2; *Liquidation Tr. v. Grobstein, Horwath & Co., LLP*, 2011 WL 13217688, at *4 (C.D. Cal. May 2, 2011) (treating a liquidation trust as a California citizen "because" the trustee "[wa]s a California citizen.") (citing *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006)).

[14] Under their alternative proposal, Plaintiffs do not seek to apply California law to the claims of class members in the seven states—AL, LA, OH, ND, OK, TX, WY—that do not recognize the aiding and abetting tort. *See* Plaintiffs' 44-Jurisdiction Appendix.

[15] *See Am. Master Lease*, 225 Cal. 4th at 1476; *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. Dist. Ct. App. 2005) ("Virtually all courts that have acknowledged the existence of aiding and abetting a fraud state that the following are the elements that must be established by the plaintiff: 1. There existed an

---

19

abetting claims in these states embrace the identical elements of actual knowledge and substantial assistance, the same evidence will determine Comerica's liability, making a multistate class proceeding efficient. *See In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at \*22 (N.D. Cal. Jan. 19, 2017) (certifying California Cartwright Act claims as to purchasers in states with substantially similar antitrust laws); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at \*14 (N.D. Cal. Feb. 8, 2016) (same).

### b. Common Questions Predominate.

As other courts in this district have concluded, aiding and abetting claims are well-suited for class treatment because they focus on the defendant's conduct and not the individual experiences of class members. *See Joint Equity Comm. of Inv'rs of Real Estate Partners, Inc. v. Coldwell Banker Real Estate Corp.*, 281 F.R.D. 422, 434 (C.D. Cal. 2012) ("Predominance is satisfied on Plaintiffs' claim for aiding and abetting because questions of assistance and knowledge focus on Coldwell, not the alleged victims."); *Gonzales*, 2007 WL 9711433, at \*10 (common issues predominated as to claims for aiding and abetting fraud and breach of fiduciary duty). The evidence in this case similarly shows that Comerica's liability will turn on common questions related to its conduct.

*First*, Comerica's knowledge of the Woodbridge fraud presents an entirely common issue that predominates in Plaintiffs' aiding and abetting claims. *See, e.g.*, *Takiguchi*, 2016 WL 1091090, at \*11 ("Whether Sterling Escrow was aware of its role in promoting a fraud and knowingly assisted the other defendants in committing the fraud are clearly common questions subject to class certification."); *Rilley v. MoneyMutual, LLC*, 329 F.R.D. 211, 219 (D. Minn. 2019) ("Defendants' liability hinges on whether Defendants knew about and substantially assisted the unlicensed lenders in making illegal loans to class members. For both claims, these common questions predominate and can be answered on a class-wide basis.").

---

underlying fraud; 2. The defendant had knowledge of the fraud; 3. The defendant provided substantial assistance to advance the commission of the fraud.").

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

1  The evidence of Comerica's knowledge does not vary by class member. As early
2  as ███ 2015, Comerica began receiving subpoenas from federal or state regulators
3  concerning Woodbridge or Shapiro—all told, at least ██ subpoenas ████████████
4  ████████████████. *See* Girard Decl., Ex. E (Comerica RFA Resps. at 20-24).
5  Comerica also received and reviewed a Texas Cease and Desist Order concluding that
6  "Respondents Woodbridge and Shapiro are engaging in fraud in connection with the
7  offer and sale of securities." *Id.*; Ex. 15 (COM0236558). Comerica's various fraud
8  detection software programs alerted Comerica's Anti-Money Laundering investigators
9  to Woodbridge's suspicious banking activity over 100 times. *E.g.*, *id.*, Exs. 4, 5, 13
10 (COM0233012; COM0233822; COM0233050). *See Chang v. Wells Fargo Bank, N.A.*,
11 2020 WL 1694360, at *5 (N.D. Cal. Apr. 7, 2020) (defendant bank "processed all
12 transactions and reviewed the accounts as part of its due diligence" and processed wire
13 transfers "that on their face indicated that they deposited investor proceeds") (citation
14 omitted).

15  **Second**, the same common conduct that shows Comerica aided and abetted fraud
16 also shows that it aided and abetted breach of fiduciary duty. *See id.* at *7; *Bruhl v.*
17 *Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 698 (S.D. Fla. 2008) ("certification of
18 the claims for aiding and abetting a breach of a fiduciary duty is appropriate because
19 none of the claim's elements requires reliance or any other factor unique to each class
20 member."). Having obtained total control of investor funds, Shapiro had a duty to
21 investors to act honestly and in good faith, but he breached his duty by misappropriating
22 the funds. *Lorenz v. E. W. Bancorp, Inc.*, 2016 WL 199392, at *10 (C.D. Cal. Jan. 14,
23 2016) (noting fiduciary duty to invest deposited money "as promised"); *Evans v. ZB,*
24 *N.A.*, 779 F. App'x 443, 446-47 (9th Cir. 2019).

25 ████████████████████████████████
26 ████████████████████████████
27 ████████████████████████████████████
28 ████████. *E.g.*, Girard Decl., Ex. H (████ Dep. at 118, 130-31, 140); Ex. 28

21



(COM1238149). Comerica's ███████████████████████████████ ███████████ recording Shapiro's monthly transfers of tens of thousands of dollars from various investment funds to his personal credit card account, wife, ex-wife, and private jet charters. *Id.*, Ex. 3 (COM0236196 (attaching COM1238149)). ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ *Id.*, Ex. J (██████ Dep. at 27:9-14).

**Third**, common evidence will determine whether Comerica substantially aided Shapiro's fraud and breach of fiduciary duty by carrying out the banking transactions that made the Ponzi scheme possible. *See Casey*, 127 Cal. App. 4th at 1145; *Evans*, 779 F. App'x at 447 (bank's "ordinary business transactions" met the substantial assistance element); *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 454 (N.D. Cal. 2012) (jury could reasonably find bank provided substantial assistance where "hundreds of millions of dollars, if not billions, flowed through Paul Financial because of RBS' involvement."). ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ Girard Decl., Ex. 11 (COM0236450 at -65); Ex. H (██████ Dep. at 192-93). Unlike the investors, Comerica analysts and executives saw what Woodbridge did with investor money, and allowed it to continue the misuse without ever closing any Woodbridge account. Comerica condoned the fraud despite being faced, time and again, with explicit evidence (including orders from state securities regulators) that Woodbridge was selling fraudulent investment securities. *Id.*, Ex. E (Comerica RFA Resps. at 20-26). Instead of demanding answers, Comerica accommodated Shapiro's requests to "move funds around," recognizing his status as a "High End client." *Id.*, Exs. 6, 8 (COM0228118 at -19; WGC IM_0720311).

In spite of Comerica's ████████████████████████████████████████ ████████████████████████████████ (*id.*, Ex. I (██████ Dep. at 30-32, 89-90)), an employee in Comerica's legal department conferred with Woodbridge's lawyers about

22

the bank's receipt of and response to a subpoena received in late 2016 from California's
Department of Business Oversight. *Id.*, Ex. 21 (COM0475528). Lawyers for
Woodbridge contacted Comerica's Executive Vice President and General Counsel for
California operations for information about this subpoena. The bank's lawyer responded
that Comerica would inform Woodbridge's attorneys when the subpoena arrived and
would seek to provide them with advance copies of the documents to be produced. *Id.*,
Ex. 20 (COM0231694 at -96-98). Woodbridge's lawyers then continued to "check in"
with Comerica, which allowed Shapiro to monitor the investigatory activities of
regulators. *Id.*, Ex. 22 (GDC-0008524).

With respect "to causation and proximate cause, the sum of the allegations establish
that [the bank's] actions played a critical role in the facilitation of the Ponzi scheme."
*Benson*, 2010 WL 1526394, at *5. Without Comerica's banking services Shapiro could
not have carried out his scheme—and, "[o]nce [Comerica] had actual knowledge of the
Ponzi scheme, [it] could reasonably foresee that its actions would have the effect of
injuring investors." *Id.*; *see Coldwell Banker*, 281 F.R.D. at 434 (rejecting contention that
individual issues predominated as to whether bank caused plaintiffs' injuries). Comerica
is free to argue that its liability will turn on the individualized experiences of class
members, such as their reasons for investing in Woodbridge securities or their knowledge
of the underlying fraud, but this argument "falls short, because" Comerica "either knew
of [Shapiro]'s scheme to defraud and took steps substantially to advance the scheme or it
didn't. Either way, its knowledge and assistance (if any) predominates as a common
issue." *Jenson v. Fiserv Tr. Co.*, 256 F. App'x 924, 926 (9th Cir. 2007); *see also First
Alliance*, 471 F.3d at 991. Moreover, Plaintiffs and the other Woodbridge investors had
no reasonable way of knowing about the Ponzi scheme, and there is no evidence that any
class member was aware of Shapiro's wrongdoing. Goldberg Decl., ¶¶ 6-7. Instead, "[a]ll
Plaintiffs have alleged that they invested in reliance on the basic representation that the
[enterprise was] a legitimate investment, and not a Ponzi scheme." *Gonzales*, 2007 WL
9711433, at *9. Class Plaintiffs allege that the underlying fraud was Woodbridge's failure

to disclose the true, predatory nature of the investment. Consol. Compl. [Doc. # 150, 151], ¶ 242. Comerica's involvement as a secondary tortfeasor raises common issues of proof, and the uniform fraudulent omissions that led class members to invest do not raise any individual issues.[16]

### c.   Individual Damage Determinations Do Not Defeat Predominance.

"At this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability[.]" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017). There is no need for expert testimony to establish damages. *See, e.g.*, *Dickey v. Advanced Micro Devices, Inc.*, 2019 WL 251488, at *6 (N.D. Cal. Jan. 17, 2019) (citing *Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017)).

Plaintiffs propose that the jury determine the total class-wide harm (*see* Plaintiffs' Trial Plan), and "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). If Plaintiffs establish Comerica's liability, damages to return the money each class member invested in Woodbridge, regardless of whether they bought notes or units, can be readily determined based on investor records. These records show the amount of each investor's investment and their net out-of-pocket losses taking into account any "returns" they received from Woodbridge and any distributions they received from the Liquidation Trust. Goldberg Decl., ¶ 30; *see Just Film*, 847 F.3d at 1120 (noting that damages could be determined based on amounts deducted from bank accounts using the defendants' "own records").

### 2.   A Class Action Is the Superior Means of Resolving This Controversy.

A class action is superior, as it represents the only realistic means of recovery for

---

[16] *See Cole v. Asurion Corp.*, 267 F.R.D. 322, 329 (C.D. Cal. 2010) (common issues predominated with respect to a common law fraud claim primarily based on omissions); *First Alliance*, 471 F.3d at 992; *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1382 (2012) (California law prohibits "failure to disclose a material fact that is misleading in light of other facts . . . the defendant did disclose.") (alterations and citation omitted).

24

most class members here. A large number of class members are seniors who invested
their savings in Woodbridge and would find it hard to retain counsel and pursue their
own lawsuit. *See Novoa v. GEO Grp., Inc.*, 2019 WL 7195331, at *19 (C.D. Cal. Nov.
26, 2019) (explaining that the "vulnerable position" of class members weighed in favor
of class mechanism); *Coldwell Banker*, 281 F.R.D. at 436 (finding class action superior
where the average class member invested tens of thousands of dollars). Comerica's
vigorous defense confirms that individual "class members would have a substantial
disincentive to expend resources pursuing their individual claims[.]" *Bentley v. United
of Omaha Life Ins. Co.*, 2018 WL 3357458, at *11 (C.D. Cal. May 1, 2018) (Gee, J.);
*Aichele v. City of Los Angeles*, 314 F.R.D. 478, 496 (C.D. Cal. 2013) ("[T]he cost of
prosecuting nearly 300 individual civil rights cases based on the same set of facts would
likely far exceed individual damages awards."). While the Liquidation Trust could have
pursued its own separate action, it has elected to participate as a class member in this
case because the Trustee believes this case represents the most efficient and promising
means of obtaining recoveries from Comerica for its role in the Woodbridge scheme.
Goldberg Decl., ¶¶ 29, 34. A class action poses "no particular difficulties" in terms of
manageability. *Falco v. Nissan N. Am. Inc.*, 2016 WL 1327474, at *13 (C.D. Cal. Apr.
5, 2016); *Martin v. Monsanto Co.*, 2017 WL 1115167, at *9 (C.D. Cal. Mar. 24, 2017).

   For these reasons, the superiority requirement is satisfied.

## VI. CONCLUSION

   Plaintiffs therefore respectfully request that the Court certify the class as defined,
appoint them to represent the class, appoint Girard Sharp LLP to serve as class counsel,
and direct the parties to submit a proposed plan of notice under Rule 23(c)(2).

          Respectfully submitted,

Dated: April 16, 2021     By: /s/ *Daniel C. Girard*

           Daniel C. Girard (State Bar No. 114826)
           Jordan Elias (State Bar No. 228731)

Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
*dgirard@girardsharp.com*
*jelias@girardsharp.com*
*ttan@girardsharp.com*
*mcox@girardsharp.com*

*Interim Lead Class Counsel*

**BERGER MONTAGUE, P.C.**
Michael C. Dell'Angelo
Barbara A. Podell
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-3000
Email: mdellangelo@bm.net
Email: bpodell@bm.net

**COHEN MILSTEIN SELLERS &
 TOLL PLLC**
Steven J. Toll
1100 New York Avenue N.W., Suite 500
Washington, DC 20005
Telephone: 202.408.4600
Email: stoll@cohenmilstein.com

**KOZYAK TROPIN & THROCKMORTON**
Harley S. Tropin
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Telephone: 305.372.1800
Email: hst@kttlaw.com

26

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEVINE KELLOGG LEHMAN SCHNEIDER
 & GROSSMAN LLP**
Jeffrey C. Schneider
Lawrence A. Kellogg
Jason Kellogg
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Email: jcs@lklsg.com
Email: lak@lklsg.com
Email: jk@lklsg.com

**SONN LAW GROUP P.A.**
Jeffrey R. Sonn
One Turnberry Place
19495 Biscayne Blvd., Suite 607
Aventura, FL 33180
Telephone: 305.912.3000
Email: jsonn@sonnlaw.com

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
Betsy C. Manifold
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619.239.4599
Email: manifold@whafh.com

*Plaintiffs' Executive Committee*

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)

**CERTIFICATE OF SERVICE**

I, Daniel C. Girard, hereby certify that on April 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document upon confirmation of e-filing.

I also certify that I caused the under-seal document to be emailed to counsel for Defendant.

By: */s/ Daniel C. Girard*

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:18-CV-00103-DMG (MRWx)